641 F.2d 954
 206 U.S.App.D.C. 1
 COMMUNICATIONS INVESTMENT CORP., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
KDAB, Inc., Intervenor.
CARMAN CORP., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
KDAB, Inc., Intervenor.
COMMUNICATIONS INVESTMENT CORP., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Ben Lomond Broadcasting Co., Intervenor.
 Nos. 78-1715, 78-1724 and 78-1885.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued 29 April 1980.
Decided 21 Jan. 1981.
As Amended March 10, 1981.
 
 John M. Pelkey, Washington, D.C., with whom William J. Potts, Jr., Washington, D.C., was on the brief, for appellant in Nos. 78-1715 and 78-1885.
 Kevin F. Reed and Michael A. Pace, Washington, D.C., were on the brief for appellant in No. 78-1724.
 C. Grey Pash, Jr., Counsel, Washington, D.C., with whom Robert R. Bruce, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief for appellee. John J. Powers, III, and Bruce E. Fein, Attys., Dept. of Justice, Washington, D.C., also entered an appearance for appellee.
 Howard M. Weiss, Eugene F. Mullin, Howard J. Braun and Irving Gastfreund, Washington, D.C., were on the brief for intervenors.
 Before WILKEY, WALD and EDWARDS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILKEY.
 Dissenting opinion filed by Circuit Judge WALD.
 WILKEY, Circuit Judge:
 
 
 1
 In these consolidated cases, despite two decisions of this court to the contrary, the Federal Communications Commission (FCC or Commission) has allowed two radio stations to locate their transmitters away from their community of license at a site overlooking a larger and more lucrative market without holding a hearing to investigate substantial and material questions of fact regarding the motives for and effects of the moves. The FCC is now apparently willing to approve such moves without a hearing even when material questions of fact remain unanswered, provided the station desiring to relocate is willing to keep up certain appearances the Commission deems of symbolic importance in displaying a station's intent to remain "located" in its smaller neighboring community of license.
 
 
 2
 Unfortunately, when critical questions of fact are unresolved on the paper record before the FCC, the public interest may get short shrift if a hearing is not held. That is why the Communications Act, the FCC's own rules, and previous FCC decisions all require the Commission to hold hearings when substantial and material facts remain to be determined. Accordingly, years ago this court twice instructed the Commission to hold the hearings plainly required by Commission rules and the Communications Act. But a pattern of summary approval for transmitter relocations on the basis of an inadequate paper record may now once again be emerging, bringing these consolidated cases before us for review. We reverse.
 
 I. INTRODUCTION
 
 3
 An understanding of what has happened in the cases before us requires some background. The signal broadcast by an FM radio station can be characterized by three factors: the station's frequency, which determines where it can be found on the dial; the station's signal strength, which is determined by the power of its transmitter and the elevation and configuration of its antenna; and the station's antenna location, which determines its area of coverage. The FCC is responsible for regulating all three.[1] In fulfilling its responsibility, the FCC has divided the portion of the radio spectrum allocated to FM broadcast stations, the band between 88 and 108 Megahertz (MHz), into 100 channels, which the FCC somewhat confusingly refers to as channels 201 through 300.[2] From this list of possibilities, communities throughout the nation have been assigned specific channels to serve them. These assignments, which specify not only frequency but also limits on authorized combinations of transmitter power and antenna elevation, are compiled in a "table of assignments" adopted as an FCC rule in 1963 after extensive rulemaking proceedings.[3] Changes to the table can be made only by rulemaking.[4]
 
 
 4
 The cases we consider today involve the assignment of stations to two neighboring cities. The first, Salt Lake City, Utah, estimated to have a population of 176,000,[5] has been allocated seven FM channels,[6] all in the same signal strength class, "Class C."[7] All seven channels are currently occupied, and the FCC has refused proposals to increase their number.[8] The second, Ogden, Utah, has only about 72,000 people,[9] and is located 33 miles almost due north of Salt Lake City.[10] Before the events which concern us, Ogden was assigned four Class C FM channels,[11] of which only three were occupied.[12]
 
 
 5
 The controversy here involves two Ogden stations, KDAB-FM, broadcasting at 101.1 MHz,[13] and KZAN-FM, broadcasting at 97.0 MHz,[14] which have succeeded in obtaining approval from the FCC to locate their antennas on Farnsworth Peak,[15] a site used by Salt Lake City stations only 18 miles west of Salt Lake City, but 41 miles, over 2.2 times as far, south southwest of Ogden.[16] The appellants in these consolidated cases are two radio stations assigned to Salt Lake City, KALL-FM and KISN-FM.[17] They challenge what they regard as an intrusion into their market.
 
 
 6
 Before we turn to the legal arguments supporting this challenge, we recount how two Ogden stations came to have their antennas at a site used by Salt Lake City stations.
 
 A. The KDAB Application
 
 7
 The KDAB story begins in April 1973, when Star Broadcasting Co. (Star), the corporate predecessor of KDAB, Inc., filed an application with the FCC for a construction permit for a new Ogden FM station the station that would become KDAB. Star first asked for a transmitter site at Farnsworth Peak, near Salt Lake City. Within a month, in May 1973, Communications Investment Corp. (CIC), the licensee of Salt Lake City station KALL, filed petitions with the FCC opposing Star's application. CIC argued that locating KDAB at Farnsworth Peak would reallocate de facto an Ogden FM channel to Salt Lake City, in violation of section 307(b) of the Communications Act of 1934, as amended.[18] Star then modified its proposal to ask for a site at Coon Peak, several miles closer to Ogden.
 
 
 8
 Star filed an Opposition to CIC's petitions;[19] in response, CIC then filed a Reply.[20] Then, realizing that there would be a hearing on the question which would be costly and risky, and, at best, would delay approval of its application, Star amended its proposal for the second time, now specifying a transmitter site on Little Mountain, a location twelve miles west of Ogden used by Ogden FM stations.[21] CIC withdrew its petition opposing Star's application, the FCC granted approval, and KDAB-FM began operations from Little Mountain in July 1975.
 
 
 9
 Only eleven months later, KDAB, by now licensed to D & B Broadcasting Co. (D & B), filed an application with the FCC to move its newly operational transmitter to the site it had originally proposed: Farnsworth Peak. The reason for the move, according to KDAB, was that it was experiencing multipath problems at its Little Mountain site.[22] A portion of its signal, it said, was traveling east to Ogden, passing over Ogden and on to a range of mountains east of Ogden called the Wasatch Front, reflecting off the peaks and then returning to the city. FM receivers in Ogden were thus receiving KDAB signals both directly from the transmitter and also from the mountains by reflection. But the reflected signals, traveling a greater distance, were arriving a short instant later than the direct signals, blurring the combined signal and degrading reception. KDAB's proposed solution: move to Farnsworth Peak. Because the path from Farnsworth Peak to Ogden runs parallel to the Wasatch Front, KDAB apparently believed that glancing reflections off the mountains on the northward path from a transmitter near Salt Lake City would be less of a problem than the head-on reflections off the mountains experienced by signals from its near-Ogden transmitter.
 
 
 10
 In its application, however, KDAB provided scant support for its claim it was experiencing multipath problems. It submitted to the Commission only a letter by a "field man" employed by the firm that had supplied the KDAB antenna, Jampro Antenna Co. of Sacramento, California.[23] The "field man" reported in what he called a "field engineering statement" that he had checked the KDAB signal at eight locations. Three of the locations were in Ogden; the remaining five were in Salt Lake City and points intermediate. He concluded on the basis of these measurements that KDAB was facing a multipath problem. The weight to be accorded his conclusion is uncertain, however; the president of the antenna company was quick to assert in a cover letter to the report that "the antenna is very much OK," while admitting that "we are not consulting engineers."[24] Furthermore, the "field mans' " qualifications were never determined.
 
 
 11
 Why the Commission was required in passing on KDAB's application to consider the possibility that the proposed move might have been motivated by more than just multipath problems appears evident. From the Ogden antenna farm at Little Mountain, KDAB could send Salt Lake City only a relatively low quality "primary service"[25] signal. From Farnsworth Peak, however, KDAB could blanket Salt Lake City with a high quality "city grade" signal.[26] Moreover, while moving to Farnsworth Peak would eliminate from KDAB's service area about 10,000 rural listeners located mostly in Box Elder County, Utah,[27] the gain of listeners located around Salt Lake City would offset this loss more than twenty times over. About 232,000 people who did not receive service from KDAB before the proposed move would be added if KDAB relocated at Farnsworth Peak.[28] And because most of those added would be in the urban Salt Lake City vicinity, the added listenership represented a more concentrated and perhaps more affluent market, and therefore consequently demographically more attractive to KDAB's potential advertisers, than the scattered rural residents of Box Elder County.
 
 
 12
 In any event, KALL-FM, now joined by another Salt Lake City station, KISN-FM, was concerned that from the new site KDAB would be a more formidable competitor in Salt Lake City. Both stations filed petitions with the FCC to deny KDAB's application,[29] using many of the same arguments advanced at the time of KDAB's first attempt to locate at Farnsworth Peak, supplemented now by the additional argument that sites free of multipath interference were available for KDAB's use in the Ogden vicinity.[30] This time around, however, the Salt Lake City opposition went unheeded; in February 1978 the FCC granted KDAB's application.[31]
 
 
 13
 The Commission held that KALL and KISN not only had failed to show that KDAB's proposed relocation would amount to a de facto reallocation of an Ogden FM channel to Salt Lake City[32] but also had failed to refute KDAB's claim that a move to Farnsworth Peak would improve reception in Ogden by eliminating multipath interference.[33] Noting that Ogden would get as strong a signal as required by Commission rules from Farnsworth Peak,[34] the Commission refused to consider as material the fact that Salt Lake City would be getting an even stronger signal than Ogden.[35] In truth, in the Commission's view KALL and KISN had fallen so far short of showing that KDAB's new transmitter site would de facto reallocate an Ogden channel to Salt Lake City that they had failed even to raise a sufficiently substantial and material question of fact to require an evidentiary hearing pursuant to section 309(d)(2) of the Communications Act.[36]
 
 
 14
 KALL and KISN were not satisfied. They petitioned for reconsideration,[37] arguing that the FCC had failed to follow its own precedent in ruling on the de facto reallocation issue, and alleging that the FCC had violated its own rules and the Communications Act in relying on KDAB's unverified engineering statement by an antenna company "field man" of unknown qualifications. In addition, they submitted a supplemental engineering statement[38] which concluded that even a portion of Ogden itself stood to lose the required "city grade" service from KDAB.
 
 
 15
 The Commission was unimpressed; in June 1978 it affirmed its previous order by denying the petition for reconsideration.[39] The Commission found the alleged shortfall in signal strength over Ogden to be "de minimis," because 99% of the Ogden population would still receive the signal strength required by the FCC rules and the shortfall for the remaining 1% would be only 1 dbu out of 70 dbu.[40] The FCC's attitude was permissive: "Once the channel has been assigned to a community by rulemaking, an applicant is generally free to choose any site so long as it provides the community of license with the degree of service prescribed by Section 73.315 of the Rules."[41]
 
 B. The KZAN Application
 
 16
 The KZAN story is similar to KDAB's, with some wrinkles of its own. It begins in 1973, after KALL's petition for dismissal of KDAB's application already had been filed. At that time a second company, Group Communications, Inc. (Group), filed an application[42] with the FCC to construct another new FM broadcast station (later to be designated KZAN) allocated to Ogden, Utah, but to broadcast from Farnsworth Peak. In view of its opposition to KDAB's proposed move, it is not surprising that KALL immediately also filed a petition for dismissal of the KZAN application,[43] using the same arguments it had used in opposition to KDAB's proposal to locate on Farnsworth Peak: that operation of an Ogden channel from a site close to Salt Lake City used by Salt Lake City stations would be tantamount to reallocating the channel to Salt Lake City in violation of the Commission's rules and the Communications Act. KALL asked the Commission either to dismiss the KZAN application or alternatively to designate it for a hearing to determine whether the proposed operation of the new station from Farnsworth Peak would be consistent with the requirements of the table of assignments.
 
 
 17
 At about the same time yet another company, Ben Lomond Broadcasting Co., filed an application to build an Ogden FM station.[44] Ben Lomond applied for the channel Group wanted, so its application was mutually exclusive with that of Group. Unlike Group, however, Ben Lomond Broadcasting proposed a transmitter site only a few miles west of Ogden on Little Mountain. Of course, in a comparative hearing to determine which applicant would better serve Ogden, Ben Lomond would have had a clearcut advantage over Group because it planned to put its transmitter near Ogden whereas Group was asking for a location close to Salt Lake City.
 
 
 18
 About five years passed with the mutually exclusive applications of Group and Ben Lomond Broadcasting languishing in the Commission's files. Then, in June of 1978, one day after the FCC issued its order affirming its approval of KDAB's move to Farnsworth Peak, Group and Ben Lomond Broadcasting asked the Commission to approve a settlement agreement they had reached between themselves.[45] Under the agreement, Group dismissed its application in exchange for a 20% minority interest in Ben Lomond Broadcasting, and Ben Lomond amended its application to substitute Farnsworth Peak as the proposed site of its transmitter.
 
 
 19
 The record does not disclose the basis of this agreement. But it is easy to speculate that there was something in it for both parties. The original Ben Lomond Broadcasting Co. eliminated the cost, risk, and delay of a comparative hearing and obtained assurance that the Commission, if it approved a construction permit for a new Ogden station, would grant the license to Ben Lomond not a competitor. Group which had gambled by filing for a transmitter location at Farnsworth Peak (and had attracted the rival application of Ben Lomond), now had a sure thing a 20% share in a station broadcasting from the desired lucrative site at Farnsworth Peak. Once it became clear, after the FCC's decision on KDAB's proposal, that the Commission would permit Ogden stations to broadcast from Farnsworth Peak, both parties may have felt it to be to their advantage to share in the spoils rather than to continue to fight.
 
 
 20
 KALL, of course, opposed the joint application as much as it had opposed the original application of Group to broadcast at Farnsworth Peak. It filed a statement with the Commission[46] suggesting that the amendment to change the transmitter location in the Ben Lomond application was a major amendment which, under FCC rules, would require the FCC to assign the application a new file number and return it to the beginning of the processing line. KALL was also quick to point out that neither Group nor Ben Lomond Broadcasting had at any time claimed that the Little Mountain transmitter site originally proposed by Ben Lomond would be subject to multipath interference, nor did the amended application of the new Ben Lomond Broadcasting provide a justification for a Farnsworth Peak site.
 
 
 21
 The Commission, however, having determined to permit Ogden stations to broadcast from Farnsworth Peak, held the new Ben Lomond application to be governed by the Commission's previous action on KDAB's application. It then granted[47] Ben Lomond's application to build KZAN. At which point KALL and KISN appealed in separate actions to this court from the Commission's actions in permitting KDAB and KZAN to locate at Farnsworth Peak without a hearing on the public interest questions involved. KDAB and KZAN intervened to support the Commission's actions in their favor.
 
 II. THE TABLE OF ASSIGNMENTS SYSTEM
 
 22
 Underlying the issues in these cases is the question whether the Federal Communications Commission has properly discharged its responsibilities under section 307(b) of the Communications Act of 1934, as amended, to: "make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each."[48]
 
 
 23
 The phrase "fair, efficient, and equitable" taken alone may seem too vague to determine policy, but its legislative history as interpreted by this court[49] discloses the significance Congress attached to those words. The predecessor of the present section was first enacted in 1927 as part of the original Radio Act of 1927[50] and was designed to provide "an equitable distribution of stations over the entire country."[51] Just one year after passage Congress amended the section with detailed instructions as to how an "equitable distribution" was to be accomplished. The nation was divided into five "zones"; the Commission was directed to allocate broadcasting service to each zone and the various states by a formula based on population.[52] In practice, however, this mechanical approach proved unsatisfactory. What resulted was a "concentration of the use of frequencies in centers of population, and the restriction of facilities in sparsely populated states, even though interference consideration (sic) would permit the operation of one or more additional stations."[53] The Commission therefore went to Congress and obtained a modification of section 307(b).[54] One of the purposes of the revision was to allow the "sparsely populated" portions of the country, especially in the West, to "secur(e) the facilities we ought to have to meet the demands of that section of the country."[55] The revised form of section 307(b), no longer requiring the application of a rigid formula, remains to this day substantially as enacted in 1936.
 
 
 24
 Our reading of this section must be informed by this history. The Commission's duty thus becomes clear. It must forestall excessive concentration of FM assignments in larger cities and ensure adequate service to smaller communities and "sparsely populated" regions.
 
 
 25
 In discharging this duty, the Commission has promulgated a "table of assignments" to distribute frequencies equitably among neighboring regions.[56] In developing this table to carry out its section 307(b) mandate, the Commission discovered that smaller communities could not all be assigned FM frequencies without signals from nearby communities interfering with one another.[57] To solve this problem, the Commission decided to assign a smaller number of high-powered stations to a limited number of central cities because a single high-powered station could cover not only a central city but provide wide-area service to the suburbs surrounding that city as well. High-powered stations of this type are classified as "Class C" stations by the Commission.[58] They are assigned in such a way that each has surrounding it an interference zone at least 65 miles in radius.[59] All stations party to these consolidated cases are Class C stations.
 
 
 26
 Thus, for example, in assigning a Class C FM channel to Salt Lake City, the Commission meant to provide coverage not only for Salt Lake City itself but for the surrounding suburbs as well. Similarly, in assigning a Class C channel to Ogden the Commission meant that not only Ogden but its suburban communities and outlying regions would receive coverage. Since Ogden is only 33 miles from Salt Lake City, of course, some overlap in these coverage areas is to be expected. A community lying midway between Ogden and Salt Lake City may be within the suburban broadcasting coverage of stations both in Ogden and in Salt Lake City. In fact, Ogden is within Salt Lake City's protected 65 mile radius, and vice versa. But many communities south of Salt Lake City and north of Ogden are within the guaranteed interference-free coverage area of only one of the two central cities.
 
 
 27
 Broadcasters, of course, would prefer to locate their transmitters near the largest available city in this case Salt Lake City because that is where the largest market exists. If left to their own devices broadcasters would congregate around the biggest city in the area. In fact, it was against just this concentration that the current version of section 307(b) was directed.[60] It is to be expected that broadcasters will constantly apply whatever pressure they can bring to bear to get FCC approval for placement of their stations as close to the heart of a major population center as possible. Conversely, it is the FCC's substantive duty under section 307(b) to prevent such movement whenever it is not in the public interest.
 
 
 28
 The FCC's duties under the statute are not solely substantive, however. Congress has also explicitly specified a quite natural and prudent procedural requirement that the Commission, in carrying out its section 307(b) mandate, hold hearings whenever an application for a transmitter location raises a "substantial and material question of fact."[61] Nonetheless over the years the Commission has occasionally succumbed to the temptation to take a shortcut around this procedural requirement by authorizing without the required hearings stations licensed to smaller communities to locate their transmitters near larger neighboring markets. The resulting controversies have twice ended in actions reaching this court.
 
 
 29
 For example, seventeen years ago this court considered a situation quite similar to the circumstances of the present case in Wometco Enterprises, Inc. v. FCC.[62] In that case two West Palm Beach, Florida, television stations petitioned the FCC to move their transmitters from a site two miles north to a site twelve miles southwest of West Palm Beach, more or less on a line between West Palm Beach and Miami, Florida, 56 miles away. The new location would have permitted the West Palm Beach stations to put a higher quality signal over all of Miami for the first time, though it was not expected there would be any loss in coverage to West Palm Beach. A Miami television station petitioned the FCC to deny these applications as a de facto reallocation of West Palm Beach television channels to Miami in violation of section 307(b). The FCC refused to hold a hearing and granted the applications. The Miami television station then appealed to this court. We remanded the case to the FCC for a hearing on the de facto reallocation question, stating in a brief per curiam opinion that "the issues presented by Wometco were so substantial that the Commission erred in disposing of them in a summary manner."[63]
 
 
 30
 A similar situation arose once again in 1965 in Louisiana Television Broadcasting Corp. v. FCC.[64] Louisiana Television involved two stations located in Houma and Baton Rouge, Louisiana. The Houma station had unsuccessfully sought redesignation as a Baton Rouge channel in a rulemaking proceeding before the FCC. Having failed in its efforts to become an official Baton Rouge channel, the Houma station then applied for a construction permit to move its transmitter to a location 47 miles from Houma but only 18 miles from Baton Rouge, more or less on a line between the two cities. The advantages were clear: the move would extend "principal city" coverage to an additional 333,000 people or so and "Grade A" or "Grade B" coverage to yet another 949,000 people.[65] Unfortunately, however, 16% of the population of Houma, the station's designated "principal city," would have been left without the "principal city" coverage then required by FCC regulations.[66] The Baton Rouge station challenged the proposed move, but the FCC approved the proposed transmitter relocation without a hearing.[67] In attempting to justify its decision, the FCC pointed out that the new location would permit the channel to bring its service to many more people.
 
 
 31
 The Baton Rouge station then appealed to this court. And once again this court remanded the case to the FCC for a hearing.[68] We pointed out five public interest questions involved, including whether the public interest warranted degradation in the signal strength at Houma and whether the move amounted to a de facto reallocation of a channel from Houma to Baton Rouge.[69] In remanding the case for a hearing, we made our position clear: "to allow the Commission to determine without a hearing the issue of whether (the Houma channel) would be reallocated might be to allow the possibility of summary and sub silentio overruling of a policy (the table of assignments) established through the rulemaking process and might deprive others of anopportunity to compete for (the Houma channel). Both the Court and the Commission have recognized that the significance of such an issue requires a full hearing...."[70]
 
 
 32
 In the aftermath of Wometco Enterprises and Louisiana Television Broadcasting the FCC followed the directions of this court by holding hearings when stations proposed to move their transmitters to locations closer to larger nearby markets and substantial questions of fact regarding the true purposes and likely results of the moves remained open. In Santa Fe Television, Inc.,[71] for example, the FCC ruled in 1969 that a hearing was required before it could determine whether to permit a Santa Fe, New Mexico, television station to locate its transmitter at a site used by Albuquerque stations only 14 miles from Albuquerque, New Mexico, but 43 miles from Santa Fe. The Santa Fe station had argued that the move to the proposed site was necessary because receiving antennas throughout New Mexico including those in Santa Fe were pointed at that site. Thus, the station argued, reception in Santa Fe would actually be improved if the station were located near Albuquerque at the same site used by Albuquerque stations.[72] Nonetheless the Commission quite correctly ruled that a hearing was needed to determine if a de facto reallocation might result.
 
 
 33
 Also in 1969 the FCC issued its leading decision in Berwick Broadcasting Corp.[73] In Berwick a broadcaster previously had filed a request with the Commission to assign an FM channel to Wilkes-Barre, Pennsylvania, but the Commission had chosen to allocate the channel to a neighboring community because Wilkes-Barre was already well served by two FM and three AM stations. The broadcaster then applied for a license to operate on the same channel, but ostensibly from Pittston, Pennsylvania, a town with a population only about one-fifth that of Wilkes-Barre. The proposed transmitter location, however, was halfway between Pittston and Wilkes-Barre, so that Wilkes-Barre would be blanketed by a strong signal. In addition, the broadcaster was already operating an AM station in Wilkes-Barre, and proposed to share staff and programing between the two stations. The FCC held that, on these facts, a full evidentiary hearing was necessary to determine if the broadcaster truly intended to serve Pittston, noting that "an applicant interested in serving (a) central city may specify a nearby smaller community so as to obtain a trasmitter site providing a strong signal over the city."[74] Sensitive to its responsibilities, the Commission emphasized that "the integrity of our 307(b) allocations must take priority over the private interests of the applicant, where significant allegations are brought to our attention indicating that a substantial doubt exists as to whether or not the proposal would provide a realistic local transmission service for its specified station location."[75] The FCC thus concluded that "the mandate of section 307(b) requires a determination of the question ... on the basis of a full evidentiary record."[76]
 
 
 34
 After a hearing, the FCC found against the broadcaster.[77] It noted that "an adverse inference was raised by the fact that (the broadcaster) proposed to locate its transmitter site midway between the two communities and thereby provide maximum coverage of the Wilkes-Barre area,"[78] and concluded that the broadcaster had "failed to meet its burden of proof"[79] to "rebut the adverse inferences stemming from these facts."[80]
 
 
 35
 Berwick thus stands for the proposition that a proposed transmitter location so close to a larger market as to raise a serious question of fact as to the applicant's true intent requires a hearing to resolve that question, particularly if other factors support the suggestion that the applicant in fact desires to serve the greater market. A suitable explanation may be forthcoming, of course. But it is up to the applicant to provide one.
 
 
 36
 The "Berwick doctrine," as it has come to be known, historically resulted from the extension to FM licensing of a similar policy, the "Suburban Community" doctrine, previously applied by the FCC to licensing questions involving standard broadcast (AM) stations.[81] As such, it can be distinguished from the de facto reallocation doctrine at issue in Wometco Enterprises, Louisiana Television, and Santa Fe Television.[82] As applied to FM licensing, however, both doctrines are simply corollaries of the system of allocating frequencies by means of a table of assignments; some careful inspection of the motives of broadcasters in selecting transmitter sites is necessary to assure that applicants do not subvert the policies behind the table. The table of assignments, of course, is not immutable. It can be modified by a proper rulemaking proceeding at which the policies of section 307(b) would be given adequate consideration. In fact, the Commission could abolish the table of assignments system altogether. But it cannot permit "summary and sub silentio overruling of a policy established through the rulemaking process."[83]
 
 
 37
 III. THE FACTORS SUGGESTING A HEARING IS NECESSARY TO DETERMINE INTENT
 
 
 38
 The cases we have just recounted comprise the leading examples of situations in which either the Commission or this court has found that "substantial and material" questions of fact exist bearing on the likelihood that a transmitter location near a larger and more lucrative market will result in a redirection of service to that market from the area of license. When such questions of fact are found to exist, section 309 requires that a hearing be held.[84] Other later cases decided by the Commission could be added to the list, but to do so here would merely reinforce by reiteration the factors of decisional significance which reappear again and again in the Commission's opinions. The factors controlling these four and later cases unfortunately emerge, however, in an unruly and tumultuous welter. None of these four nor any later case purports to isolate the factors that are the principal determinants of whether a factual issue exists regarding intent, or to decide which factors or how many should be decisive on the hearing issue.
 
 
 39
 It is true, of course, that questions of intent are by their very nature tied to the particular facts presented in each case, and determining an individual broadcaster's intent or ability to serve this or that city as the Commission was required to do in the cases before us requires a flexible, carefully focused investigation into the particular facts of the case at hand. But a focused inquiry is possible only if we know on what to focus.
 
 
 40
 In the cases before us we are called upon to decide whether the Commission acted arbitrarily and capriciously when it determined that no "substantial and material" questions of fact remained to be answered before it decided to approve transmitter locations on Farnsworth Peak. We could attempt to answer this question by reference to our own thinking and judgment concerning the outer limits of the insubstantial and immaterial. To adopt such a course, however, would be to risk trespassing on the Commission's territory by putting this court in the business of making broadcasting policy. A safer course would be for us to rely on the past decisions of the Commission and this court to assist us in determining when a question of fact so material and substantial as to require a hearing has been raised. That is the path we intend to follow.
 
 
 41
 The raw cases taken by themselves, however, provide uncertain guidance because they are not bound together by systematic analysis. The Commission's expertise in these matters doubtless enables it to determine whether a hearing is required without explicit reference to an organized analysis of the factors of decisional significance on which it relies. Lacking such expertise, however, this court finds it difficult without some sort of map to traverse the dense thicket of factors emerging from these cases. Absent some systematic enumeration of the factors that have proved decisive in the past, we find it nearly impossible to give the principled consideration to the present cases which it is our duty, as a court of law, to provide. And so, because the controlling principles to be applied to the cases before us are presented in confusing disarray, we must first pause before turning our attention to the proper resolution of these cases to create our own map of the factors of decisional significance we must apply here.
 
 
 42
 Wometco Enterprises, Louisiana Television, Santa Fe Television, Berwick and later FCC decisions establish at least nine factors which have tended in the past to suggest to the Commission or this court that a de facto reallocation or Berwick issue must be ventilated in an evidentiary hearing before a transmitter location can be approved. We collect and review those factors here.
 
 
 43
 (1) This first and most basic factor is the ratio of the population of the city of license to that of the larger city; it is likely that the temptation to cater to a larger market will grow in proportion to the relative size of that market. In Santa Fe Television, for example, the ratio was 37,000 people in Santa Fe to 225,000 in Albuquerque, or a ratio of about one to six.[85] In Berwick the ratio was 12,400 to 63,600, or about one to five.[86]
 
 
 44
 (2) A second key factor is the ratio of the distance between the proposed transmitter site and the city of license to the distance between the transmitter site and the larger city to which the station may be, in effect, moving. The importance of this factor is obvious. In Wometco Enterprises this ratio was only 56:12[87] and in Berwick the site was "midway" between the cities so the ratio was about 1:1.[88] Louisiana Television and Santa Fe Television presented more extreme cases with ratios of 18:47[89] and 14:43,[90] respectively.
 
 
 45
 (3) A third factor closely related to the second is the expected ratio of the signal strength in the city of license to the signal strength in the larger nearby city. Obviously, an applicant's plan to provide a stronger signal to a nearby more attractive market raises a doubt whether it intends to serve that market rather than the smaller market to which it is licensed. In Santa Fe Television, for example, the larger city was expected to receive a 96 dbu signal, while Santa Fe was to receive only a 76 dbu signal.[91]
 
 
 46
 (4) A fourth factor is whether a portion of the city of license is expected actually to lose coverage or, especially in the case of a Class C station with a duty to serve a widespread coverage area, whether there will be a loss area outside the city of coverage. In Wometco Enterprises no loss was expected in the licensed city,[92] but in Louisiana Television 16% of the population of the principal city would have received a weaker signal from the proposed transmitter site than required by FCC regulations.[93] In Santa Fe Television 12,000 people northeast of Santa Fe were to receive no television from any source whatever if the proposed site near Albuquerque were authorized.[94]
 
 
 47
 (5) A fifth factor of significance is whether the proposed site is already in use by stations assigned to the larger city. In Santa Fe Television the fact that Albuquerque stations were using the proposed site was significant.[95] No matter where a station claims to be "located," if FM tuners receive a signal from the same place as other stations allocated to the larger city, from a purely engineering perspective, the "location" of the station is in the larger city.
 
 
 48
 (6) A sixth factor is whether the station shares common ownership with an AM station in the larger city and plans to share staff, facilities, or programing with it as well. It is difficult to argue that a station planning to use programing created for a larger market does not plan to serve that market. In Berwick the FCC placed weight on the planned joint use of the staff and facilities of the broadcaster's AM outlet in the larger city.[96]
 
 
 49
 (7) A factor directly bearing on the ultimate question of intent is whether the station has evinced a prior interest in locating in the larger market. Because it is subject to manipulation, however, the absence of this factor is not significant. A station carrying out a sophisticated plan can easily avoid showing its hand at too early a stage. The presence of this factor, however, may be telling. If a station already has manifested an attraction toward a larger market when it proposes a transmitter location near that market, it is hard to ignore the possibility it still has designs to serve that market. Both in Berwick and in Louisiana Television this factor was present and significant, but its absence was not a consideration in either Santa Fe Television or Wometco Enterprises.
 
 
 50
 (8) Another extremely telling factor would be a proposal to move the studio as well as the transmitter to the larger market, though in none of the cases we have discussed were plans to move the studio a factor. Should a station ask for permission to relocate its studio as well as its transmitter, its intentions would be plain to all. As a result, this is a factor unlikely often to arise in real cases. After all, in this age of satellite communications, it may well be that a station would be willing to locate its studio in the Nevada desert if that were the price of positioning its transmitter on the World Trade Center in Manhattan.
 
 
 51
 (9) A final factor to be considered is whether there is some unique advantage to the site proposed. In Santa Fe Television it was suggested that television antennas throughout the state were already pointed at the proposed site and none other.[97] This "advantage" did not carry the day and the FCC ordered a hearing in spite of it. But in other cases unique advantages of terrain or otherwise might sufficiently explain a proposed transmitter location without a hearing. The required showing will rarely be possible, however, because it will be necessary for the proposing station to demonstrate that no other site closer to its primary market will do; showing a negative beyond dispute is not often easy.
 
 
 52
 These nine factors culled from the leading precedents provide a framework helpful to this court for determining whether the Commission's actions in the present cases are not arbitrary and capricious in light of previous Commission actions and the past decisions of this court. That we have extracted these factors from the decided cases for our convenience here should certainly not be read to suggest that this court is laying down a novel per se rule requiring the Commission to hold full evidentiary hearings in all cases where an application proposes to acquire the ability to serve a larger market than he now serves, thereby altering the settled judicial policy of deference to the Commission in determining when a hearing is necessary under section 309. Such a rule would represent a usurpation of the role delegated to the Commission of deciding in the first instance when a hearing is needed to resolve a substantial and material question of fact. It would indeed be novel and unwise for this court to impose any such absolute procedural requirement in an area where the expert judgment of the Commission is, and should be, paramount.
 
 
 53
 Our purpose here is quite to the contrary. By following the Commission's own analysis as well as that to be found in earlier decisions of this court rather than applying our own judgment de novo on the issue whether substantial and material questions of fact exist in the cases before us, we seek not to undermine the Commission's authority to set policy in this area. Instead, we explicitly rely here on what analysis we can glean from past decisions, not on our own invention. Obviously, by merely collecting together in one place the factors which in the past have propelled this court and the Commission itself to require a section 309 hearing, we in no way intend to foreclose future Commission action so long as it is accompanied by a reasonable explanation in harmony with the Commission's statutory obligations to hold hearings whenever a "substantial and material" question of fact remains in dispute. The Commission is free to add to the list of factors we have collected, subtract from the list, or, of course, reject the list outright. Given the task of reviewing the present cases, however, and pending any further enlightenment that may be forthcoming from the Commission regarding its policies on the hearing issue, we prefer to use the factors we can cull from past cases as a baseline for deciding the cases before us, rather than inject ourselves into the agency's policymaking process.
 
 
 54
 IV. THE KZAN AND KDAB MOVES IN LIGHT OF THIS ANALYSIS
 
 
 55
 A. The Applicable Standard of Judicial Review
 
 
 56
 At the threshold of our inquiry into the Commission's decisions in the cases before us it is appropriate to fix firmly in mind the extent of our review. We must be mindful that it is the Commission not this court to whom Congress gave the authority to determine in the first instance whether issuance of construction permits and licenses meets the various requirements set down by statute, FCC regulations, and precedent; and it is the Commission not this court to whom it gave the authority in the first instance to decide whether it will make that determination only after a full hearing.
 
 
 57
 In the cases now before us the only questions properly open for consideration are whether the FCC could make the factual determinations it did without benefit of a "full hearing," which is required by statute only in those cases where an application filed under 47 U.S.C. § 309(a) raises a "substantial and material question of fact," or where "the Commission for any reason is unable to make the finding" of public interest, convenience and necessity required by section 309(a). Under the settled law of this Circuit, our court has a very limited role in reviewing the Commission's denial of a section 309 hearing. As we have said: "the scope of our review is quite narrow; we defer to the expertise and experience of the Commission within its field of specialty and reverse only where the Commission's position is arbitrary, capricious or unreasonable ... (a)nd it is clear that the decision of when hearings are necessary or desirable to clarify issues is one which lies in the first instance with the Commission." For example, in National Association for Better Broadcasting v. FCC[98] we considered an appeal from an FCC decision to renew a television broadcast license without a full hearing because the Commission had found no substantial and material question of fact in dispute, and because the appellants had failed to present prima facie evidence that a license renewal would not be in the public interest. We said:
 
 
 58
 Section 309(d) provides that the FCC shall grant or renew a license if it finds, after considering the application and all pleadings submitted, that there "are no substantial and material questions of fact and that a grant of the application would be consistent with (the public interest)." Any "party in interest" objecting to the renewal may file a petition to deny. A petitioner's allegations must be both "substantial and specific," sufficient "to show that ... a grant of the application would be prima facie inconsistent with (the public interest);" "allegations of ultimate, conclusionary facts or more general allegations on information and belief, supported by general affidavits ... are not sufficient." Where the Commission finds that such a showing has not been made, it may refuse the petition, "issu(ing) a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition."Aside from the sufficiency of the petition to deny, a hearing will not be required where the facts are undisputed, and the "disposition of (an appellant's claims (turn) not on determination of facts but inferences to be drawn from those facts." (sic) Finally, a hearing is not required to resolve issues which the Commission finds are either not "substantial" or "material," whether or not the underlying facts are disputed.
 
 
 59
 We review the Commission's decision to determine if it reasonably concluded that there were no "substantial and material questions of fact" and that license renewal would be in the public interest.
 
 
 60
 The extent of our review in such cases as this is narrow. "We defer to the expertise and experience of the Commission within its field of speciality." The decision whether to hold hearings "is a matter in which the Commission's discretion .. (sic) is paramount." Although we must be satisfied that the Commission took a hard look at all the relevant issues, if the Commission's action was not arbitrary, capricious or unreasonable, we must affirm.[99]
 
 
 61
 That statement could not be clearer in according to the Commission primary responsibility and wide discretion to decide whether a hearing is necessary. In the case of an FCC decision not to hold a hearing under section 309, as in the case of other agency actions, this court does not substitute its judgment on the facts and substantive issues for that of an agency. We have not the competence, desire, or time to redo an agency's work.
 
 
 62
 But the Commission's decision not to hold a hearing is nonetheless subject to review, just as are other agency actions. In reviewing agency decisions we do examine at least four questions: First, was the action taken within the agency's powers under its basic statute? Second, was the procedure followed by the agency correct, that is, was there administrative due process? Third, was the result reached supported by substantial evidence? And, fourth, was the rationale by which the agency reached its result logical, that is, was there a demonstrated logical connection between the evidence adduced and the conclusion reached by the agency or was the agency action arbitrary or capricious? These four questions are at the core of judicial review of administrative agency actions.
 
 
 63
 The agency conclusion under review here is the FCC's determination that no "substantial and material question of fact" exists regarding whether the public interest would be served by the location of the transmitters of Ogden stations near Salt Lake City. This agency conclusion raises no questions requiring an inquiry here into the scope of the FCC's authority under its statute. Nor does this FCC action raise any purely procedural questions which this court must reach;[100] Congress preempted the key procedural issue when it specified that the Commission shall hold hearings whenever a "substantial and material question of fact" remains to be resolved. Our inquiry here is focused solely on whether the FCC's determination that there was no "substantial and material question of fact" flowed logically from the evidence in the record. To help us to determine whether a question requiring a hearing exists on the basis of the record as it now stands, we turn for guidance to the past determinations on this same question by this court and by the Commission itself as summarized by the analysis of precedent given above.
 
 
 64
 B. Are There Unresolved Questions of Fact in These Cases?
 
 
 65
 When we examine the circumstances of the cases before us in the light of the factors of decisional significance we see immediately that five of these factors tilt strongly against the applicants. (1) The population ratio of Ogden[101] to Salt Lake City[102] is substantial, about 1:2.4. (2) Likewise, the distance ratio is 41:18,[103] startlingly similar to the ratios of 47:18 and 43:14 in Louisiana Television[104] and Santa Fe Television,[105] and much higher than the one-to-one ratio in Berwick[106] and the 12:56 ratio in Wometco.[107] (3) The ratio of signal strengths expected in Salt Lake City and Ogden cannot be found in the record; physical proximity alone, however, suggests that the signal over Salt Lake will be considerably stronger than that in Ogden. Furthermore, Ogden is expected to receive the absolute minimum signal permitted by FCC regulations.[108] A portion of Ogden may not even receive the minimum.[109] (4) Moreover, 10,000 people in Box Elder County will be deprived of service by the move,[110] though it is possible, but by no means certain, they will receive some service from other stations.[111] (5) And, as in Santa Fe Television, the new transmitter location is presently being used by stations serving the larger city.[112]
 
 
 66
 On the other side of the ledger, four of the nine factors, while not leaning much in favor of KDAB and KZAN, at least do not weigh against them. While both stations have shown some prior interest in the Farnsworth Peak site, neither has gone so far as (7) to request designation as a station serving Salt Lake City. But this is hardly surprising in view of the Commission's recent rejection of a proposal to add another channel near Salt Lake City;[113] such a direct and candid approach, while commendable, would have been tactically foolish in view of the weight the Commission is known to place on such prior attempts when ruling on transmitter relocation proposals. For similar reasons, it is difficult to put too much importance on the absence in the plans of each station of any proposal either (6) to share programing with a Salt Lake station or (8) to move the studio as well as the transmitter. (9) Which leaves only one factor of nine left available to support the proposals for a Farnsworth Peak site: the suggestion that Farnsworth Peak has unique advantages for minimizing multipath interference. But even here the case on the record is weak. The uniqueness of the site is hotly disputed[114] and far from proven, as indeed is even the existence of a multipath problem.[115]
 
 
 67
 In sum, of the nine factors culled from past cases bearing on the issue whether a factual question of the true intent of these applicants exists which must be answered in an evidentiary hearing, five weigh heavily against them, three are of little weight one way or the other, and at least one can fairly be described as unresolved on the record as it now stands. Using the analysis we have gleaned from Wometco Enterprises, Louisiana Television, Santa Fe Television, and Berwick, we must conclude that a substantial and material question of the intent of KDAB and KZAN has been raised but not resolved on the paper record.
 
 C. The Commission Response
 
 68
 The Commission, however, purports to resolve these cases without a hearing. In support of its summary disposition of the de facto reallocation questions at issue here, the Commission notes that both KDAB and KZAN are operating from Ogden studio locations and intend to continue doing so;[116] that from Farnsworth Peak both stations comply, or nearly comply, with the requirement[117] that a station provide a minimum signal to the city of license; and that both stations will better serve the FCC guidelines[118] favoring the combination of the highest possible antenna and the smallest possible transmitter from the heights of Farnsworth Peak than from Little Mountain. Finding the applicants thus in literal compliance with the Commission's rules concerning transmitter and studio location, the Commission argues that the stations opposing the move "have a very heavy burden to demonstrate that the Commission's grant of these applications without an evidentiary hearing was arbitrary and capricious."[119]
 
 
 69
 In making this suggestion the Commission ignores the obvious fact that the cases before us are controlled by decisional law buttressing Commission rules against de facto subversion, not by the bare rules themselves. All the key early cases cited to us, Wometco Enterprises, Louisiana Television,[120] Santa Fe Television, and Berwick involved applicants in full literal compliance with all relevant FCC rules, yet hearings were nonetheless ordered to determine whether the table of assignments, an FCC rule, would be undercut by the proposed move.
 
 
 70
 Moreover, the parties opposing the applications for transmitter relocation in these cases hardly were required to bear a "very heavy burden." In Wometco Enterprises, for example, this court remanded the cases to the FCC for evidentiary hearings solely on the basis that each of the stations involved had applied "for permission to move its transmitter to a point ... in the direction of (the larger market in) Miami, with additional coverage but without loss of previous coverage";[121] surely the stations opposing the move cannot fairly be said to have borne a "very heavy burden." And in Santa Fe Television the allegations ran remarkably parallel to those in the cases before us: (1) the ratio of the distance between the proposed transmitter site and Santa Fe to the distance between the proposed transmitter site and Albuquerque was 43 miles to 14 miles while the ratio of the distance from Farnsworth Peak to Ogden to the distance from Farnsworth Peak to Salt Lake City is 41 miles to 18 miles; (2) the proposed site in Santa Fe Television was being used by Albuquerque stations, while Farnsworth Peak is presently being used by Salt Lake City stations; (3) no loss of coverage was expected in Santa Fe itself, but 12,000 people northeast of Santa Fe were to lose coverage, were the transmitter to be located at the proposed site, while in the present case, very little loss is expected in Ogden, but 10,000 people are expected to lose coverage in Box Elder County; and (4) in both cases arguments were available to suggest that the site proposed was unique: in Santa Fe Television, it was the fact that all antennas in the state were pointing toward Albuquerque, in the present case, that Farnsworth Peak offers unique multipath advantages. With facts so similar, we are unable to discern any "very heavy burden" in Santa Fe Television or in the other leading cases which has not been equally met by the appellants here.
 
 
 71
 In fact, the Commission's earlier decisions prudently put the burden on the broadcaster asking for permission to move toward a more lucrative market, not on the opposition. For example, the FCC's second opinion in the Berwick case, after the remand for a hearing, is replete with references to the presumption operating against the party seeking to move its transmitter.[122] In Santa Fe Television, the burden of proof at the evidentiary hearing ordered by the Commission was again explicitly placed on the television station seeking to locate near the larger market.[123] The record is thus plain that the FCC requires the broadcaster with suspect motives to do the explaining.
 
 
 72
 The Commission is apparently aware that it is almost impossible to justify its actions in the cases before us on the basis of its earlier decisions; in its brief it nearly admits as much when it argues that "the types of questions raised with respect to de facto reallocation and Berwick issues largely confine each case to its own facts."[124] In keeping with this argument, the Commission attempts to distinguish the key cases from the present controversy by pinpointing the factual differences among them. The Commission notes[125] that in Louisiana Television, for example, de facto reallocation was not the only issue; FCC rules concerning minimum interstation mileage and policies concerning the development of UHF broadcasting were part of the case as well. Santa Fe Television is also different, the Commission argues,[126] on three counts: the suburban loss area northeast of Santa Fe would have been left without TV service from any source while in the present cases Box Elder County may continue to receive FM from other stations; there were no multipath problems alleged in Santa Fe while such interference is claimed for Ogden; and the claims that other suitable sites were available were "more substantial" than in the present cases. To distinguish Berwick the Commission notes[127] that it involved shared AM programing, while the present proposals do not. And so forth.
 
 
 73
 In thus attempting to distinguish the prior cases, the Commission has run amok with a venerable common law method. Distinguishing cases on the basis of principled differentiations is one thing; consciously setting out to "confine each case to its own facts," another one which would virtually eliminate all precedent. After all, finding factual variations from case to case is a trivial task, and to say a case has been confined to its facts is just a polite way to say it has been ignored. But the Commission cannot be so cavalier with its own precedent and those of this court without suggesting that the rationale by which it is reaching its conclusions is either illogical or sub rosa, and thereby inviting reversal. To us, the precedent is clear: in the cases before us six of the nine key factors discussed in the leading cases are probably present and five of those six undisputedly so.[128]
 
 
 74
 In its arguments to us the Commission, of course, emphasizes the absence in these cases of the three remaining factors: relocation of studios,[129] previous efforts to have the channel reassigned,[130] and duplication of programing and sharing of staff and facilities with a co-owned station in the larger market.[131] But the absence of these factors is of little weight, though their presence might be significant. The first of these three is mostly of theoretical interest. In not one of the leading cases was there any mention in the opinion about a proposal that the studio be moved. Such a proposal would be too obvious a signal of illegitimate intent and of only modest benefit to the broadcaster, and, in fact, would violate FCC rules.[132] The second and third factors are no less manipulable. No sensible station would go to the trouble of applying to have its channel reassigned by FCC rulemaking if it could accomplish the same result with a simple transmitter relocation neatly achieved without so much as a hearing, as KDAB and KZAN appear to have done. This is especially true now that it is well known that an honest proposal for reassignment will be rewarded with diminished prospects for subsequent approval of a transmitter relocation application. And for the same reason, because it is now understood that the FCC frowns on the sharing of staff and facilities with a co-owned station in a neighboring larger city, no station would propose to take advantage of such paltry economies at the risk of losing access to a highly lucrative new market. In fact, the importance to a broadcaster of such petty savings fades in direct proportion to the attractiveness and size of the larger market into which it hopes to move. In sum, the weight and emphasis the Commission gives to these thin arguments merely underscore the weakness of its position.
 
 
 75
 Having thus attempted to dispose of its own early decisions as well as those of this court, the Commission refers us to several of its recent decisions. All but one of these were decided by the Commission after its decisions in the cases now before us for review.[133] In view of our disposition of these cases today, these later Commission decisions, which rely on the cases we remand, provide little authority. One decision to which we have been referred, Public Service Broadcasters, Inc.,[134] was decided three years before the initial decision by the Commission in the KDAB case. Its facts are in some respects reminiscent of those in the present cases. We do not now express a view whether it was correctly decided in light of the earlier decisions of this court in Wometco Enterprises and Louisiana Television.
 
 V. CONCLUSION
 
 76
 We thus conclude that the Commission erred in deciding that no "substantial and material" questions of fact were present in the record before it. In fact, beyond the question of intent, other factual matters remain inadequately explored as well. We believe substantial questions of fact remain to be answered in at least three areas of concern. These questions include: (1) the area of loss both within the city of license (Ogden) and the widespread coverage area outside the immediate Ogden area; (2) the degree of degradation of the signal in the city of license (Ogden) compared with the strength gained in the larger market (Salt Lake City); and, of course, (3) whether the programing of these stations will adequately serve Ogden's needs if the stations are allowed to use Farnsworth Peak. Because we believe these questions may raise substantial considerations under the "suburban community" policy or the "de facto reallocation" doctrine, we believe the Commission's decision to act without a hearing was plainly unreasonable in this case. The overwhelming weight of authority both from this court and the Commission itself compels us to direct the Commission to hold evidentiary hearings to determine the factual questions which must be resolved before the Commission can properly decide whether permitting these nominally Ogden stations to locate their transmitters at a site previously used only by Salt Lake City stations will subvert the policies of the table of assignments by de facto reallocating these stations to Salt Lake City.
 
 
 77
 The table of assignments does not specify that stations will be allocated to the Salt Lake City-Ogden metropolitan area; rather it allocates seven channels to Salt Lake City alone and four channels to Ogden alone. Perhaps this split allocation was a mistake. Perhaps the public interest would better be served by an allocation of eleven channels to the Standard Metropolitan Statistical Area surrounding both Ogden and Salt Lake City. Perhaps it makes no sense to identify Class C stations surrounded by 65-mile interference-free zones as licensed to one or the other of two cities separated by only 33 miles. If so, the Commission has an affirmative duty to commence rulemaking proceedings to modify the table of assignments to rectify this situation. But in the meantime it is unfortunate that it is once again necessary for this court to remind the Commission that the "summary and sub silentio overruling of a policy established through the rulemaking process" cannot be tolerated.[135]
 
 
 78
 We reverse and remand these cases to the Commission for proceedings consistent with this opinion. Throughout this opinion we have emphasized that, on the basis of the record before us and applying what we understand to be the Commission's policies as revealed by past cases, we are forced to conclude that substantial and material questions of fact remain to be answered. We recognize, however, that the Commission, by modifying its policies and practices, could affect the nature of and the extent to which an evidentiary hearing is required. Should the Commission choose not to hold an evidentiary hearing on remand, that decision, of course, could be the subject of future judicial review. As to the merits of these cases, we offer no view regarding how they should be decided.
 
 
 79
 So Ordered.
 
 WALD, Circuit Judge, dissenting:
 
 80
 I am in accord with the premises my colleagues use in deciding this case,[1] but I find it impossible to apply them to the facts and come to the same conclusion. I agree that the court's focus should be "solely on whether the FCC's determination that there were no 'substantial and material questions of fact' flowed logically from the evidence in the record." Majority Opinion at 972. I further agree that a full hearing would be necessary if a substantial and material question of fact were at issue in this case. But I respectfully disagree with the majority that any substantial questions of fact remain in dispute in this case that would require a full hearing to resolve. Only the ultimate determination as to the applicants' intent to serve Salt Lake City rather than Ogden is disputed by petitioners, and that involves only "inferences to be drawn from facts already known, (or) the legal conclusions to be derived from those facts." Anti-Defamation League v. FCC, 403 F.2d 169, 171 (1968), cert. denied, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969). In such cases the Commission has clear and settled authority to draw such inferences without a full hearing. Id.; National Association for Better Broadcasting v. FCC, 591 F.2d 812, 815 (D.C.Cir.1978); Alianza Federal De Mercedes v. FCC, 539 F.2d 732, 736 (D.C.Cir.1976); Columbus Broadcasting Coalition v. FCC, 505 F.2d 320, 324 (D.C.Cir.1974); Stone v. FCC, 466 F.2d 316, 323 (D.C.Cir.1972); Marsh v. FCC, 436 F.2d 132, 135-36 (D.C.Cir.1970). It is only when the underlying facts themselves are material, substantial, and in actual dispute, that a full hearing is required by the statute in question here, 47 U.S.C. § 309.
 
 
 81
 It is true, of course, that placement of the two Ogden radio stations' antennas at a site close to Salt Lake City (Farnsworth Peak) could give rise to a legitimate question of whether those stations intend to provide local broadcast service to Salt Lake City rather than Ogden. If they did, this would circumvent the Commission's "table of assignment" rule and violate the FCC's de facto reallocation and Berwick doctrines which seek to prevent a station from avoiding its obligation to serve its assigned community of license.
 
 
 82
 However, a station's application to locate its antenna closer to a larger neighboring community need not invariably give rise to such suspicions. See Great Trails Broadcasting Corp. (WJAI-FM), 59 FCC2d 916, 918-19 (1976) (no hearing needed on de facto reallocation issue despite the fact that station's proposal would place its antenna closer to Dayton (pop. 243,000) than to its designated community of license, Eaton (pop. 6,000)). See also Central Alabama Broadcasters, Inc. (WSLA-TV), 68 FCC2d 1339, 1340 (1978) (no hearing needed on relocation which would place antenna two miles closer to Montgomery than to Selma, the smaller city of license). This is particularly so where the station has a valid justification for wishing to place its antenna at the new location.
 
 
 83
 In this case the Commission found that placement of the Ogden stations' antenna at Farnsworth Peak would improve their reception in Ogden, while enabling them to conform more closely to Commission rules which put a premium on the highest elevation and lowest power output consistent with adequate service to the area.[2] The majority sidesteps this crucial finding by stating that, in its opinion, the evidence which the Commission relied upon indicating the existence of a "severe problem of multipath interference"[3] with the radio signal emanating from KDAB's previous site near Ogden (Little Mountain) was "weak," and that the "uniqueness" of the new site at Farnsworth Peak was "hotly disputed." Majority Opinion at 973-974. There is, however, absolutely no evidence in the record contradicting KDAB's field engineering statement that the multipath interference problem at the Little Mountain antenna site was a substantial one.[4] The field statement found "obvious reflections ... off the top and canyon of the mountains." After explaining the technical reasons why and how this occurred, the report concluded:
 
 
 84
 There is no doubt at all that the problem facing you is one of propagation not antenna. After your signal leaves the antenna, it passes over Ogden, goes further east, hits the mountains, and is reflected back over Ogden. These reflections were measured as strong as minus 6 DB, which means 25% of the power was coming from the mountains! Therein lies your problem.
 
 
 85
 Field Engineering Statement, J.A. at 161 (emphasis supplied).
 
 
 86
 The majority expresses concern regarding the "unverified" character of four sworn statements, each of which affirmed the existence of the multipath problem, and which together represented all the evidence in the record on the multipath interference issue. Majority Opinion at n.115; see also id. at 959-960. The majority also speculates as to whether or not the qualifications of the affiants were adequate, and whether the testing procedures and equipment were appropriate for the task. Id. at n.115. I do not think, however, that this court possesses the expertise to secondguess the Commission on so technical a matter as its finding that multipath interference existed in the signals of a FM radio station in Utah, when that finding is uncontradicted by any evidence in the record. The record in fact amply supports the Commission's finding that a multipath problem at Little Mountain did exist, and that radio service to Ogden would be improved by moving to Farnsworth Peak.[5] So long as the evidence in the record supporting the Commission's finding is credible and undisputed, we should leave its finding about the benefits of the move to Ogden listeners alone. And given a legitimate justification for the move to improve service in Ogden we have no reason on this record to tell the Commission that it had to hold a formal hearing to search for some ulterior motive possibly lurking behind the move.
 
 
 87
 The majority opinion's suspicion that KDAB and KZAN really intend to switch their service from Ogden to Salt Lake City also appears to underestimate their ability to broadcast effectively to Salt Lake City even from the old Little Mountain site. The majority stresses that since the Ogden stations can place "only a relatively low quality 'primary service' signal" (at least 60 dbu, or 1mV/m) over Salt Lake City from the old Little Mountain site, but can place a "high quality 'city grade' signal" (at least 70 dbu, or 3.16mV/m) over Salt Lake City from the new Farnsworth Peak site, this must be strong evidence of an attempt to penetrate the Salt Lake market. Majority Opinion at 11. The majority fails to tell us, however, that the "primary service area" which would include Salt Lake City from Little Mountain is defined as that "area within which radio ... reception is not normally subject to objectionable interference or fading." R. Graff, Modern Dictionary of Electronics 558 (5th ed. 1977). Thus, even if appellants succeeded in forcing the Ogden stations to move back to Little Mountain, those stations would still be sending to Salt Lake City listeners reception "not normally subject to objectionable interference or fading." Id. If Salt Lake residents could receive interference-free reception from Little Mountain, it is clearly unwarranted to assume, as the majority opinion apparently does, that moving from Little Mountain to Farnsworth Peak is necessarily evidence of intent to relocate into the Salt Lake market.
 
 
 88
 Even more significant is the fact undisputed by the majority that "the (table of assignments) allocation of a Class C channel to Ogden contemplated use of a maximum facility with 100 kW effective radiated power at an antenna height of 2,000 feet above average terrain. Such a facility, even if located north of Ogden, would encompass all of Salt Lake within its (city grade) contour." D & B Broadcasting Co., Inc., supra, 67 FCC2d at 573 n.8 (emphasis supplied). See generally Majority Opinion at 964. Thus the very table of assignments which the Berwick/de facto reallocation doctrines are designed to protect assumed that Class C Ogden stations like KDAB and KZAN might provide a "high quality 'city grade' signal" to Salt Lake City. In light of these facts, I must agree with the Commission that "the simple fact that the KDAB proposal will provide primary city grade service to Salt Lake City is not a valid ground for objection." 67 FCC2d at 573 n.8. Cf. Majority Opinion at 960.
 
 
 89
 In order to confirm the absence of any material factual dispute concerning the applicants' intent which would necessitate a full hearing, I will for illustrative purposes turn to the five factors which, the majority opinion states, cast substantial doubt upon their motives. Of the five, only two could even conceivably involve a factual dispute, and even if they did, their resolution would not be particularly relevant to the outcome here. The remaining three concern inferences to be drawn from facts already known or the legal conclusions to be derived from those facts, and hence do not require a formal hearing to resolve. See cases cited at p. 956 supra.
 
 
 90
 The first factor concerns the particular ratio of signal strengths expected in Salt Lake City and Ogden, which the majority states "cannot be found in the record." Majority Opinion at 978, see also id. at 973. The majority speculates, however, that "physical proximity alone ... suggests that the signal over Salt Lake will be considerably stronger than that in Ogden." Id. at 973. Even if this is true, I question the relevance of that fact where, as here, it is acknowledged that the required city-grade signal will continue to be provided the city of license, Ogden. None of the petitioners here suggested that ascertaining this particular ratio was necessary or even helpful in developing a record for this case. Cf. Santa Fe Television, Inc., 18 FCC2d 741, 742 (1969) (listing of comparative signal strengths of a television broadcaster in allegations made by petitioner who wished a hearing on a de facto reallocation issue). And the Commission has never before held that determining the signal ratio was important enough to require a full hearing. On the contrary, the Commission's focus is usually on whether the proposal would continue to provide city-grade service to the original community, or whether a loss area would be created. Great Trails Broadcasting Corp. (WJAI-FM), 59 FCC2d 916, 919 (1976).[6] Therefore the Commission stated in this case, "the fact that the proposed change will give KDAB a stronger signal in Salt Lake City violates no Commission Rule, so long as Ogden receives the requisite (city-grade) service." D & B Broadcasting Co., Inc. (KDAB), supra, 67 FCC2d at 572. In short, acknowledging that Salt Lake City will receive a somewhat stronger city-grade signal than Ogden, it is dubious at best that knowing the particular ratio of the two signals will help in determining which audience the broadcasters intend to woo.
 
 
 91
 But even if the difference in city-grade signals was a material factor in this regard, I think it unlikely that determining the ratio of signal strengths would invariably require a full evidentiary hearing. The Commission surely has other means to obtain that data if it needs it, and "(i)f more information is required, the method by which it is to be gathered 'is, of course, a matter for the Commission.' " Bilingual Bicultural Coalition v. FCC, 595 F.2d 621, 630 (D.C.Cir.1978) (en banc). See generally United States v. FCC, No. 77-1249, Slip Op. at 39n. 87, 4o (D.C.Cir., Mar. 7, 1980) (en banc) ("The substantiality and materiality of purported issues of fact, and the need for further information, are issues to be evaluated in the first instance by the Commission in the light of its public interest responsibility. This court's oversight role is quite limited." "The sad truth about ... evidentiary inquiries is that they take time; and time often works to the advantage of one party over another.... For that reason this court has held (that the) 'decision of whether or not hearings are necessary or desirable is a matter in which the Commission's discretion and expertise is paramount.' ").
 
 
 92
 The only other factor in the majority's calculus susceptible to any factual controversy relates to the predicted "loss area" resulting from the move to Farnsworth Peak. See Majority Opinion at 973-977. The majority expresses concern about two types of loss: loss of city-grade service to a portion of Ogden; and loss of primary service to some 10,000 people in Box Elder County, north of Ogden. As to the former, we have only an allegation, submitted so late in the proceeding as to be in violation of the Commission's procedural rules,[7] that .4 square mile of Ogden would receive a 69 dbu signal instead of the 70 dbu required for city-grade service. See D & B Broadcasting Co., Inc. (KDAB), supra, 69 FCC2d at 1121. The Commission, nonetheless, did address the issue and concluded that "the alleged shortfall is ... de minimis." Id. I agree; but more important, I fail to see how a hearing would change that conclusion which, we must assume, is based on the Commission's expert judgment.
 
 
 93
 As to the alleged loss of primary service to some 10,000 residents in Box Elder County, no dispute exists here either over the fact of the loss, or its size and location. The Commission's finding that two stations, KQPD-FM and KSL-FM, "provide service to a substantial part of the (predicted) loss area" is not contested. D & B Broadcasting Co., Inc. (KDAB), supra, 67 FCC2d at 573 n.10; Majority Opinion at n.111. The only possible factual controversy I can find surrounds the Commission's finding that the entire loss area is within the predicted contours of both a third and a fourth station, KBLW-FM and KVWJ-FM. The Salt Lake City stations argued, without supporting affidavits, that the Wasatch Mountains may block the signal of these two stations and therefore they "may not provide" service to the entire loss area. However, the possibility of less than total coverage of the predicted loss area by the third and fourth stations does not loom large enough in this proceeding to require a hearing as to the precise coverage of these stations, particularly in light of the uncontested fact that at least two stations do provide service to a substantial part of the predicted loss area. "Contrary allegations and affidavits which create some possibly unresolved factual issue do not invariably necessitate an evidentiary hearing...." Broadcast Enterprises, Inc. v. FCC, 390 F.2d 483, 485 (D.C.Cir.1968).
 
 
 94
 The three additional factors which are cited as suggesting the need for a hearing do not, on their face, involve any disputed factual questions. The first relates to the population ratio of Ogden to Salt Lake City.[8] The second concerns the ratio of distances between the transmitter and Ogden, and the transmitter and Salt Lake City.[9] The third is whether the new site at Farnsworth Peak is already in use by stations assigned to Salt Lake City.[10] All three of these "factors" involve facts that have already been ascertained and are undisputed. The only issue over which dispute exists is the inference to be drawn from these facts; therefore a hearing on them is not necessary. See p. 956 supra.
 
 
 95
 Finally, the majority asserts, almost in passing and without any elaboration, that a "substantial (question) of fact remain(s) to be answered ...(:) whether the programming of these stations will adequately serve Ogden's needs if the stations are allowed to use Farnsworth Peak." Majority Opinion at 977-978. I am frankly at a loss to discern how or why the majority finds this to be a substantial and unanswered question on this record. It is uncontested that the stations' broadcast studios will remain in Ogden and that there will be no sharing of programming with Salt Lake stations. Most important, there is no evidence that the stations do not intend to provide programming directed specifically to the needs of Ogden.[11] These factors are highly significant in determining whether a Berwick/de facto reallocation issue really exists,[12] and each of them clearly weighs in favor of the conclusion that from Farnsworth Peak these stations will continue to direct their programming efforts to Ogden rather than Salt Lake City. The Commission so found,[13] and I see no evidence inconsistent with that finding.
 
 CONCLUSION
 
 96
 I cannot agree that the Commission acted arbitrarily or capriciously in denying a hearing in this case. There were, in my opinion, no material, substantial questions of fact left unanswered that required a hearing to resolve. In this case the basic issue of the applicants' intent to continue to serve the Ogden community as their primary audience was clearly one which could be decided upon inferences drawn from known facts. Some might disagree with the Commission's decision, but that is an altogether separate issue from holding that it was required to hold a hearing before drawing those inferences. For my own part, I believe that on this record the Commission acted entirely reasonably in finding that the change in antenna location was an effort to improve coverage to the stations' primary Ogden market, not an attempt to corner a new Salt Lake City market in defiance of the Commission's Berwick/de facto reallocation policy. The Commission did not need to hold a hearing to so decide. I therefore respectfully dissent.*
 
 
 97
 stations opposing applications of other stations to locate transmitters away from community of license at site overlooking larger and more lucrative market were not required to bear "very heavy burden," as urged by Federal Communications Commission but, rather, according to Commission's earlier decisions, burden was on broadcasters asking permission to move toward more lucrative market, and it should have been required that broadcasters with suspect motives do the explaining. Communications Act of 1934, § 307(b) as amended 47 U.S.C.A. § 307(b).
 
 
 
 [1]
 47 U.S.C. § 303 (1976). Section 303 provides that "the Commission from time to time, as public convenience, interest, or necessity requires, shall ... (c) Assign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate; (d) Determine the location of classes of stations or individual stations; ...."
 
 
 [2]
 47 C.F.R. § 73.201 (1979). Section 73.201 contains a table which gives the channel number corresponding to each frequency used for FM broadcasting. For example, 88.1 MHz has been designated as channel number 201, while 107.9 MHz has been designated as channel number 300
 
 
 [3]
 47 C.F.R. § 73.202 (1979). The table in § 73.202 contains the channels other than noncommercial educational channels assigned to the various communities in the United States as well as U.S. territories and possessions. The noncommercial educational FM assignments to channels 201 to 220 for communities in Arizona, California, New Mexico and Texas are found in § 73.507
 The rulemaking which led up the adoption of the table of assignments took place over a period of several years during the early 1960's. For the key decisions, see, Revision of FM Broadcast Rules, Particularly as to Allocation and Technical Standards, 40 F.C.C. 901 (1964) (conflicting proposals for allocations of Chicago channel 294 resolved); id. at 868 (allocation of channels to Hawaii, Alaska, Puerto Rico, and the Territories and rules for power increases for then-existing short-spaced stations); id. at 747 (1963) (final allocation of channels to communities within the coterminus 48 states). See also id. at 812 (changes in assignments to about forty communities); id. at 728 (tentative table of assignments presented) (1962); id. at 720 (treatment of stations previously authorized to use greater power than specified as maximum by the new table); id. at 662 (FCC conclusion that table of assignments system may be desirable).
 The Commission adopted a table of assignments system early in the history of FM broadcasting under which FM channels were assigned to specific cities as they are now in the current table of assignments. But in 1958 that original table was deleted and for several years thereafter the Commission experimented with the assignment of FM channels on the same general basis as the Commission was assigning AM channels at that time by ad hoc consideration of individual proposals by potential broadcasters to use a particular frequency or channel at a specific location. The key consideration weighed by the Commission in ruling on these applications was whether the proposed use would cause interference to other existing stations. See, e. g., Telemusic Co., 30 F.C.C. 240 (1961). This method of assigning FM channels proved unacceptable, and so the Commission in 1961 began the extensive rulemaking process which led to the current comprehensive table of assignments. In returning to the table of assignments method, the Commission concluded that questions about FM radio applications "must be resolved on the basis of fixed rules, generally applicable, which can be used by the Commission, its staff, and by private parties, to determine the disposition to be made of an application or potential proposal." Revision of FM Broadcast Rules, Particularly as to Allocation and Technical Standards, 40 F.C.C. 662, 667 (1962).
 
 
 [4]
 47 C.F.R. § 1.401(d), .420 (1979)
 
 
 [5]
 Salt Lake City had a 1970 census population of about 172,000 people, and is estimated currently to have a population of 176,000
 
 
 [6]
 47 C.F.R. § 73.202 (1979). The channels allocated are 227, 231, 246, 254, 262, 278 and 282
 
 
 [7]
 Id. A Class C channel is permitted a maximum effective radiated power of 100 kilowatts and a maximum antenna height above the average terrain of 2,000 feet. Id. § 73.206(5). The minimum effective radiated power of a Class C station is 25 kilowatts. Id. § 73.211(a)
 
 
 [8]
 Salt Lake City was assigned six Class C FM channels in the 1963 table of assignments. Revision of FM Broadcast Rules, Particularly as to Allocation and Technical Standards, 40 F.C.C. 747, 778 (1963). Salt Lake City acquired its seventh FM channel after rulemaking in 1966. Amendment of Section 73.202, Table of Assignments, FM Broadcast Stations, 40 F.C.C. 1058, 1061-62 (1966). In 1977 the Commission was petitioned to assign by rulemaking a Class C frequency to Granger-Hunter, Utah, an unincorporated community of 9,029 people in 1970 12 miles southwest of Salt Lake City and immediately below Farnsworth Peak. The Commission refused to grant the frequency on the basis that a station at Granger-Hunter would realistically serve Salt Lake City. Amendment of Section 73.202(b), Table of Assignments, 40 Rad.Reg.2d (P & F) 535, 538 (1977)
 
 
 [9]
 Ogden had a 1970 census population of 69,478 people. Its population is estimated to have grown by 3,000 people since that time. Ogden and Salt Lake City are in the same Standard Metropolitan Statistical Area
 
 
 [10]
 Coast & Geodetic Survey, U.S. Department of Commerce, Special Publication No. 218, Airline Distances Between Cities in the United States 194 (1947)
 
 
 [11]
 47 C.F.R. § 73.202 (1979). The channels allocated are numbers 238, 250, 266, and 270
 
 
 [12]
 In addition to the two stations which are intervenors in the cases before us, Ogden is served by station KQPD. Reply Brief for Appellants at 18
 
 
 [13]
 Channel 266. Whenever there would be no resulting ambiguity, we refer to the parties throughout this opinion by the call letters of the radio stations of which they are licensees. Use of call letters as a shorthand for the licensee has the advantage that it eliminates the confusion that might be caused by the changes in corporate identity and ownership that have occurred during the course of the events under consideration here
 KDAB is currently licensed to KDAB, Inc., a Utah corporation. KDAB was previously licensed to D & B Broadcasting Co., Inc., which was also the licensee of KSXX-AM in Salt Lake City. The principals of D & B Broadcasting and KDAB, Inc., were the same in March 1978 when KDAB-FM was assigned to KDAB, Inc. Subsequent ownership changes have severed the connection between KDAB, Inc., and D & B Broadcasting Co. Brief for Appellee at 9 n.6. D & B Broadcasting Co. is itself the successor to yet a third corporation, Star Broadcasting Co. Brief for Appellants at 2.
 
 
 [14]
 Channel 250. KZAN is licensed to Ben Lomond Broadcasting Co., a Utah corporation. Ben Lomond Broadcasting is the product of a merger between two predecessor corporations, Group Communications, Inc., and Ben Lomond Broadcasting (whose name was retained by the merged entity). Both Group Communications and the original Ben Lomond Broadcasting had filed mutually exclusive applications for the construction permit for KZAN. The corporate merger was part of a settlement agreement in which Group Communications agreed to withdraw its application in exchange for receiving a minority interest in Ben Lomond Broadcasting. Brief for Appellants at 2-3
 
 
 [15]
 D & B Broadcasting Co. (KDAB), 67 F.C.C.2d 570, 42 Rad.Reg.2d (P & F) 589 (1978) (FCC approval of application to relocate KDAB transmitter and antenna to Farnsworth Peak site), reprinted in Joint Appendix (J.A.) at 243; D & B Broadcasting Co. (KDAB), 69 F.C.C.2d 1116, 43 Rad.Reg.2d (P & F) 551 (1978) (denial of petition for reconsideration of KDAB transmitter relocation), reprinted in J.A. at 330; Ben Lomond Broadcasting Co. (KZAN), 68 F.C.C.2d 1331, 43 Rad.Reg.2d (P & F) 1598 (1978) (FCC approval of construction of KZAN at Farnsworth Peak), reprinted in J.A. at 343
 
 
 [16]
 Farnsworth Peak is an "antenna farm," located in the Oquirrh Mountains. At the time of KDAB's application, five Salt Lake City broadcasters, KLUB-FM, KSOP-FM, KSL-FM, KSL-TV, and KRSP-FM, were broadcasting from Farnsworth Peak, and two others, KWOH-FM and KWIC-TV, had proposed to broadcast from that site. None of these stations were licensed to Ogden. Petition to Dismiss or Deny of Carman Corp. 5 (filed 25 Apr. 1977), reprinted in J.A. at 137, 141
 
 
 [17]
 KALL is licensed to Ninety-Four Corp., a wholly-owned subsidiary of Communications Investment Corp. (CIC). CIC also owns KALL-AM in Salt Lake City through a wholly-owned subsidiary, Salt Lake City Broadcasting Co. Brief for Appellants at xii n.*. KISN-FM is owned by Carman Corp., a Utah corporation. Brief for Appellants at 2. Carman Corp. is also the licensee of KLUB-AM in Salt Lake City. Joint Brief for Intervenors at 1
 
 
 [18]
 Star Broadcasting Co. Opposition to Petition for Dismissal of Application and Alternative Petition to Deny, (filed 5 July 1973) reprinted in J.A. at 22. The Opposition is also reprinted in J.A. at 170
 
 
 [19]
 Id
 
 
 [20]
 Communications Investment Corp. Reply to Opposition, (filed 16 July 1973) reprinted in J.A. at 81
 
 
 [21]
 D & B Broadcasting Co. Opposition to Petition to Dismiss or Deny Filed by Communications Investment Corp. (filed 6 May 1977), reprinted in J.A. at 149 ("This amendment was filed after counsel advised that hearing would mean a delay of up to two years, and an estimated cost of $50,000 for attorneys' fees".)
 
 
 [22]
 Id.; D & B Broadcasting Co. Opposition to Petition to Dismiss or Deny Filed by Carman Corp. (filed 6 May 1977), reprinted in J.A. at 193
 
 
 [23]
 D & B Broadcasting Co. Opposition to Petition to Dismiss or Deny Filed by Communications Investment Corp. (filed 6 May 1977), reprinted in J.A. at 149, 158-62
 
 
 [24]
 The full text of the cover letter to the field report reads as follows:
 Gentlemen:
 Attached is a report by our field man Bill Cunningham, who visited your station on January 5th and 6th. Frankly, your reflection problem is the worst we have encountered!
 I held a staff meeting with my people and we agree on Bill's conclusion. My recommendation is that you move your present transmitting site.
 We are not consulting engineers so we recommend that you retain an experienced man. We'd be happy to work with him, and give him all our observations.
 It is regrettable that we could not find a simple and inexpensive fix for your problem. However the antenna is very much OK, but the propagation is terrible. Only a site change will cure this problem.
 Sincerely,
 /s/ Peter K. Onnigan
 President
 Id. at 158.
 
 
 [25]
 Brief for Appellee at 11 n.8. The Commission defines a "primary service" signal as one having a signal strength of at least 1.0 millivolt per meter (mV/m)
 
 
 [26]
 A "city grade" signal has a strength of at least 3.16 mV/m
 
 
 [27]
 D & B Broadcasting Co. (KDAB), 67 F.C.C.2d 243, 246 n.10 (1978). Prior to the move to Farnsworth Peak these rural listeners in Box Elder County were receiving "primary service" of at least 1.0 mV/m from KDAB. Another approximately 32,000 people, located in Cache County, Utah, would be predicted to lose service from KDAB as the result of a move to Farnsworth Peak. These potential listeners, however, apparently never received line-of-sight service from KDAB because of their position on the other side of the Wasatch Mountains from the KDAB transmitter at Little Mountain
 
 
 [28]
 Id
 
 
 [29]
 Petition to Dismiss or Deny of Communications Investment Corp. (filed 25 Apr. 1977), reprinted in J.A. at 128; Petition to Dismiss or Deny of Carman Corp. (filed 25 Apr. 1977), reprinted in J.A. at 137
 
 
 [30]
 Petition to Dismiss or Deny of Communications Investment Corp. (filed 25 Apr. 1977), reprinted in J.A. at 128, 133-34; Petition to Dismiss or Deny of Carman Corp. (filed 25 Apr. 1977), reprinted in J.A. at 137, 143-44
 
 
 [31]
 D & B Broadcasting Co. (KDAB), 67 F.C.C.2d 570 (1978), reprinted in J.A. at 243
 
 
 [32]
 Id. at 571
 
 
 [33]
 Id. at 572
 
 
 [34]
 Id
 
 
 [35]
 Id
 
 
 [36]
 Id. at 574
 
 
 [37]
 Petition for Reconsideration of Communications Investment Corp. (filed 30 March 1978), reprinted in J.A. at 248; Petition for Reconsideration of Carman Corp. (filed 30 March 1978), reprinted in J.A. at 277
 
 
 [38]
 Reply to Applicant's Response to Petition for Reconsideration of Carman Corp. (filed 24 April 1978), reprinted in J.A. at 317, 322
 
 
 [39]
 D & B Broadcasting Co. (KDAB), 69 F.C.C.2d 1116 (1978)
 
 
 [40]
 Id. at 1121 n.14. In addition, the Commission noted that Carman Corp.'s allegation that a small part of Ogden would not receive the signal strength required by FCC rules had first been made in a reply to which KDAB had had no opportunity to respond. As a result, Carman Corp.'s allegation was defective under § 1.45 of the FCC rules. According to the Commission, Carman should have presented its allegations in its petition to deny rather than on reconsideration, pursuant to § 1.106(c)(2) of the rules. The Commission therefore found Carman Corp.'s allegation to be untimely
 The "dbu" is a logarithmic unit of signal strength. 70 dbu corresponds to 3.16 mV/m, or to what the Commission refers to as "city grade" service. Id.
 
 
 [41]
 Id. at 1118
 
 
 [42]
 See Ben Lomond Broadcasting Co., 68 F.C.C.2d 1331 (1978)
 
 
 [43]
 Id
 
 
 [44]
 Id
 
 
 [45]
 Joint Request for Approval of Agreement of Ben Lomond Broadcasting Co. and Group Communications, Inc. (filed 21 June 1978), reprinted in J.A. at 327
 
 
 [46]
 Statement of Communications Investment Corp. (filed 6 July 1978), reprinted in J.A. at 337
 
 
 [47]
 Ben Lomond Broadcasting Co., 68 F.C.C.2d 1331 (1978)
 
 
 [48]
 47 U.S.C. § 307(b) (1976)
 
 
 [49]
 See Pasadena Broadcasting Co. v. FCC, 555 F.2d 1046, 1049-51 (D.C.Cir.1977)
 
 
 [50]
 Pub.L.No.69-632, ch. 169, § 9, 44 Stat. 1166 (1927)
 
 
 [51]
 67 Cong.Rec. 5479 (1926) (Statement of Congressman White)
 
 
 [52]
 Act of 28 Mar. 1928, Pub.L.No. 70-195, ch. 263, 45 Stat. 373
 
 
 [53]
 Letter on S. 2243 from Chairman of FCC, 80 Cong.Rec. 6032 (1936); H.R.Rep.No.2589, 74th Cong., 2d Sess. 3 (1936); S.Rep.No.1588, 74th Cong., 2d Sess. 3 (1936)
 
 
 [54]
 Act of 5 June 1936, ch. 511, Pub.L.No.74-652, 49 Stat. 1475, codified at 47 U.S.C. § 307(b) (1976)
 
 
 [55]
 80 Cong.Rec. 6032 (1936) (Statement of Senator Wheeler)
 
 
 [56]
 47 C.F.R. § 73.201 (1979). See discussion at text accompanying notes 2-4 supra
 
 
 [57]
 Revision of FM Broadcast Rules, Particularly as to Allocation and Technical Standards, 40 F.C.C. 747, 751 (1963)
 
 
 [58]
 Id. at 758
 
 
 [59]
 Id. at 684
 
 
 [60]
 See text accompanying notes 49-55 supra
 
 
 [61]
 47 U.S.C. § 309(e) (1976)
 
 
 [62]
 314 F.2d 266 (D.C.Cir.1963) (per curiam), rev'g Scripps-Howard Radio, Inc., 22 Rad.Reg. (P & F) 1054 (1962)
 
 
 [63]
 Id. at 267. The brevity with which the Wometco Enterprises court disposed of what it apparently considered to be a clear-cut case was criticized by this court a few years later as providing "only a cryptic one-sentence rationale." Marsh v. FCC, 436 F.2d 132, 136 (D.C.Cir.1970)
 
 
 [64]
 347 F.2d 808 (D.C.Cir.1965) (per curiam), rev'g St. Anthony Television Corp., 2 Rad.Reg.2d (P & F) 348 (1964)
 
 
 [65]
 St. Anthony Television Corp., 2 Rad.Reg.2d (P & F) 348, 357 (1964). The definitions of the "Grade A" and "Grade B" field intensity contours for television can be found at 47 C.F.R. § 73.683 (1979)
 
 
 [66]
 47 C.F.R. § 73.685(a) (1964). The shortfall expected was only 1 dbu out of 77 dbu
 
 
 [67]
 St. Anthony Television Corp., 2 Rad.Reg.2d (P & F) 348 (1964)
 
 
 [68]
 Louisiana Television Broadcasting Corp. v. FCC, 347 F.2d 808 (D.C.Cir.1965) (per curiam)
 
 
 [69]
 Id. at 810-11
 
 
 [70]
 Id. at 811 n.6
 
 
 [71]
 18 F.C.C.2d 741 (1969)
 
 
 [72]
 Id. at 742. The Commission stated the Santa Fe station's position this way: "That antennas in the State are oriented towards Sandia Crest; that because of height and location in almost the dead center of the State, television signals from Sandia Crest are available to almost all the homes in the State; and that locating the transmitter at other sites would cause the signal from the Santa Fe station to come either directly into the rear or into the side of the antennas in Santa Fe." Id
 
 
 [73]
 20 F.C.C.2d 393 (1969)
 
 
 [74]
 Id. at 394-95
 
 
 [75]
 Id. at 396
 
 
 [76]
 Id
 
 
 [77]
 P.A.L. Broadcasters, Inc., 40 F.C.C.2d 546 (1973)
 
 
 [78]
 Id. at 547
 
 
 [79]
 Id
 
 
 [80]
 Id. (footnote omitted)
 
 
 [81]
 There is no table of assignments for AM stations, and applicants for an AM license may specify any community. In pressing an application before the FCC for a grant of an AM license, an applicant gains a significant advantage if it proposes to provide the first local service to a community. To obtain this advantage, some applicants were specifying suburban communities as their city of license, while actually intending to provide service to a nearby central and much larger city. To prevent this from happening, the Commission established a policy that whenever an applicant proposed to provide a strong signal to a community of at least 50,000 persons having at least twice the population of the applicant's specified community, the presumption would be that the applicant was actually proposing to serve the larger community rather than the specified community. This is known as the "Suburban Community" presumption. Policy Statement on Section 307(b) Considerations, 2 F.C.C.2d 190, 193, reconsid. denied, 2 F.C.C.2d 866 (1965). In 1975 the "Suburban Community" presumption was relaxed to the extent that it now applies only in situations involving competing applications. AM Station Assignment Standards, 54 F.C.C.2d 1 (1975)
 
 
 [82]
 The Commission has defined these closely related policies in this way:
 ... de facto reallocation involves an attempt to utilize a channel assigned to one community in order to establish a broadcast service in another community, thereby depriving the assigned community of service from that channel. So long as it appears that an applicant will provide service to the assigned community, additional service rendered by it to other communities does not result in de facto reallocation. Our suburban community policy, however, involves an applicant's intent to direct its programming efforts and overall broadcast operations toward a nearby larger community rather than to the smaller suburban community which it has specified as its community of license.
 Hall Broadcasting Co., 71 F.C.C.2d 235, 237 (1979) (emphasis original).
 In the context of this case, the two policies raise basically one and the same issue: whether with their antennas at Farnsworth Peak, KDAB and KZAN will be providing local broadcasting service, i. e., directing their programing efforts to Salt Lake City rather than to Ogden. From a somewhat formalistic point of view, however, the question of intent can only be raised under the suburban community doctrine when there is a "city-suburb relationship between the proposed community of license and the larger community which will receive service from the proposed station." Id. at 238. It is worth noting that for census purposes, Ogden and Salt Lake City are part of the same Standard Metropolitan Statistical Area.
 In addition, a sufficiently drastic violation of the suburban community policy would apparently also result in violation of the de facto reallocation doctrine, by resulting in so complete a redirection of programing to the larger community as to be tantamount to a withdrawal of service from the area of license. For purposes of our analysis here the distinction between the suburban community policy and the de facto reallocation doctrine thus has little functional significance.
 
 
 [83]
 Louisiana Television Broadcasting Corp. v. FCC, 347 F.2d 808, 811 n.6 (D.C.Cir.1965)
 
 
 [84]
 47 U.S.C. §§ 309(d)(2), (e) (1976)
 
 
 [85]
 18 F.C.C.2d 741, 741 (1969)
 
 
 [86]
 20 F.C.C.2d 393, 393 (1969)
 
 
 [87]
 314 F.2d 266, 267 (D.C.Cir.1963)
 
 
 [88]
 20 F.C.C.2d 393, 394 (1969)
 
 
 [89]
 347 F.2d 808, 809 (D.C.Cir.1965)
 
 
 [90]
 18 F.C.C.2d 741, 741 (1969)
 
 
 [91]
 Id
 
 
 [92]
 314 F.2d at 267
 
 
 [93]
 347 F.2d at 810 n.3. The shortfall was 1 dbu out of a required 77 dbu. St. Anthony Television Corp., 2 Rad.Reg.2d (P & F) 348, 351 (1964)
 
 
 [94]
 18 F.C.C.2d at 742
 
 
 [95]
 Id
 
 
 [96]
 20 F.C.C.2d at 396
 
 
 [97]
 18 F.C.C.2d at 742. The applicant in Santa Fe Television claimed that locating the transmitter at any other site would cause the signal from the Santa Fe station to come either directly into the rear or into the side of the antennas in Santa Fe. Moreover, the applicant suggested that because of the height and location of the Albuquerque transmitter site television signals from it would be available to almost all the homes in the state of New Mexico
 
 
 [98]
 591 F.2d 812 (D.C.Cir.1978)
 
 
 [99]
 Id. at 815-16 (footnotes omitted)
 
 
 [100]
 See note 135 infra
 
 
 [101]
 See note 9 supra
 
 
 [102]
 See note 5 supra
 
 
 [103]
 See note 10 supra and accompanying text; note 16 supra and accompanying text
 
 
 [104]
 See note 89 supra and accompanying text
 
 
 [105]
 See note 90 supra and accompanying text
 
 
 [106]
 See note 88 supra and accompanying text
 
 
 [107]
 See note 87 supra and accompanying text
 
 
 [108]
 See note 40 supra and accompanying text
 
 
 [109]
 Id. The expected shortfall, 1 dbu out of 70 dbu, is strikingly similar to the shortfall of 1 dbu out of 77 dbu in St. Anthony Television Corp., 2 Rad.Reg.2d (P & F) 348, 351 (1964)
 
 
 [110]
 See note 27 supra and accompanying text
 
 
 [111]
 The FCC has noted that the Box Elder County loss area should receive service from another Ogden FM station, KVFM, and is within the predicted contours of KBLW-FM and KVWJ-FM, each assigned to Logan, Utah. Two other FM stations, KQPD-FM and KSL-FM, provide service to a portion of the loss area. CIC and Carman Corp., however, note that in the wake of the FCC action on KDAB and KZAN, KQPD has filed an application to move to Farnsworth Peak as well. Reply Brief for Appellants at 18. CIC and Carman also point out that KVFM has not yet been built, Brief for Appellants at 34, and the Commission admitted (in denying the CIC and Carman petitions for reconsideration of the grant of approval to KDAB) that KVFM had not yet applied for program test authority. 69 F.C.C.2d 1116, 1120 n.11 (1978). Finally, CIC and Carman argue that the Logan stations KBLW-FM and KVWJ-FM may not provide service to the loss area, because these stations are located on the far side of the Wasatch Mountains. In determining the number of people affected by KDAB's move to Farnsworth Peak, the Commission itself assumed that the Wasatch Mountains would cut off reception from approximately 32,000 people in Cache County. CIC and Carman argue that if these people did not receive KDAB, listeners in Ogden cannot receive the Logan stations
 
 
 [112]
 See note 16 supra
 
 
 [113]
 See note 8 supra
 
 
 [114]
 The Commission notes that CIC and Carman have claimed that KDAB has failed to show that no alternative sites near Ogden are available. The Commission, however, accepted KDAB's response discussing a number of possible alternate sites and claiming to demonstrate none of them is capable of curing its multipath interference problems. D & B Broadcasting Co., (KDAB) 67 F.C.C.2d 570, 572 & n.5 (1978). CIC and Carman point out, however, that the Commission failed to discuss other sites suggested by them in detail, including the new KQPD site west of Ogden. Brief for Appellants at 49. CIC had submitted an engineering study based on an examination of topographic maps by a communications consulting engineer which concluded that a number of potential sites for the KDAB transmitter existed much closer to Ogden than to Farnsworth Peak. Statement of George E. Gautney, reprinted in J.A. at 18
 
 
 [115]
 The Commission based its conclusion that the KDAB signal was subject to severe multipath interference on an unverified report by the manufacturer of KDAB's antenna, which itself was based on an unverified statement by the manufacturer's field representative, reprinted in J.A. at 158-67, buttressed by affidavits from two of KDAB's principals, Starley D. Bush and Paul R. Droubay, and from its Chief Engineer, Robert L. Chamberlain. See affidavits reprinted in J.A. at 306-08. Each affiant stated that he had personally observed the antenna company field representative make measurements at various reception sites in Ogden, Salt Lake City, and points intermediate. Neither Bush nor Droubay is an engineer, however, and there is no indication in the record that Mr. Chamberlain has any qualifications beyond the First Class Radio Telephone Operator's License required as a prerequisite to his serving as Chief Engineer of an FM broadcast station. It is unclear whether the holder of a First Class Radio Telephone Operator's License necessarily has a technical background adequate to supervise a field strength measurement in a knowledgeable manner. Furthermore, the field representative's report does not contain the information necessary such as tabulated data and an indication of what equipment was used and how to enable anyone not present at the measurements to verify their accuracy
 It is worth noting that the Commission has promulgated regulations describing the manner in which field strength measurements are to be made. Although those regulations do not apply directly to the measurements involved here but concern only persons making field strength measurements for formal submission to the Commission in rulemaking proceedings and persons making such measurements upon the direct request of the Commission, they provide a basis for evaluating the data submitted by KDAB. For example, at each measuring location the regulations require that the following procedure be employed:
 (i) The instrument calibration is checked.
 (ii) The antenna is elevated to a height of 30 feet.
 (iii) The receiving antenna is rotated to determine if the strongest signal is arriving from the direction of the transmitter.
 (iv) The antenna is oriented so that the sector of its response pattern over which maximum gain is realized is in the direction of the transmitter.
 (v) A mobile run of at least 100 feet is made, which is centered on the inner section of the radial and the road, and the measured field strength is continuously recorded on a chart recorder over the length of the run.
 
 
 [47]
 C.F.R. § 73.314 (1979). The regulations exact many other requirements including specified methods for reporting measurements. In particular, tables of field strength measurements for each measuring location are required to be submitted. See Id. There is no indication in the record that these procedures were followed for the measurements made by the antenna company's field representative. Furthermore, the information in the field representative's report does not enable subsequent evaluation and verification of the methods by which the data were collected which might be possible if the reporting requirements of the regulations had been followed. For example, the field representative's report does not contain "a list of calibrated equipment used in the field strength survey, which, for each instrument, specifies its manufacturer, type, serial number and rated accuracy, and the date of its most recent calibration by the manufacturer, or by a laboratory." Id. at (b)(3) (iv)
 There is no indication in the record that the FCC made any effort to use its own engineers to verify the measurements submitted by KDAB.
 
 
 [116]
 Brief for Appellee at 29, 51
 
 
 [117]
 47 C.F.R. § 73.315(a) (1979)
 
 
 [118]
 Id. at § 73.315(b)
 
 
 [119]
 Brief for Appellee at 32
 
 
 [120]
 After this court remanded the Louisiana Television case to the Commission for a section 309 hearing, the applicant amended its application to specify a site closer to its city of license. From that site the applicant would have provided a "city grade" signal to all of its city of license (prior to the amendment, 16% of the city of license would not have received the required "city grade" coverage, Louisiana Television Broadcasting Corp. v. FCC, 347 F.2d 808, 810 n.3 (D.C.Cir.1965)). After the amendment, the applicant was in full compliance with all relevant FCC rules. The applicant then argued to the Commission that a section 309 hearing was no longer necessary both because it would now provide city grade coverage to all of the city of license and because its main studios would be located in the city of license as well. Nonetheless, the Commission rejected the applicant's arguments and required a hearing. St. Anthony Television Corp., 8 F.C.C.2d 294, 298 (1967)
 
 
 [121]
 314 F.2d 266, 267 (D.C.Cir.1963)
 
 
 [122]
 P.A.L. Broadcasters, Inc., 40 F.C.C.2d 546, 547 (1973) ("an adverse inference was raised by the fact that P.A.L. proposed to locate its transmitter site midway between the two communities and thereby provide maximum coverage of the Wilkes-Barre area"); id. ("P.A.L. had failed to meet its burden of proof under the Suburban Community issue"); id. ("the adverse inferences stemming from these facts"); id. at 548 ("an applicant seeking to rebut the Suburban Community presumption")
 
 
 [123]
 Santa Fe Television, Inc., 18 F.C.C.2d 741, 745 (1969) ("the burden of proof is placed upon Santa Fe Television, Inc.")
 
 
 [124]
 Brief for Appellee at 35
 
 
 [125]
 Id. at 40-40a
 
 
 [126]
 Id. at 42-43
 
 
 [127]
 Id. at 53-54
 
 
 [128]
 See text accompanying notes 101-15
 
 
 [129]
 Brief for Appellee at 51
 
 
 [130]
 Id. at 54-55
 
 
 [131]
 Id. at 53-54
 
 
 [132]
 The Commission's rules require that a station's main studio be located within the boundaries of its city of license. 47 C.F.R. § 73.210(2) (1979)
 
 
 [133]
 Sarasota-Bradenton, Fla. TV Co., 70 F.C.C.2d 699 (1979); Central Ala. Broadcasters, Inc., 68 F.C.C.2d 1339 (1978); Hall Broadcasting Co., 44 Rad.Reg.2d (P & F) 637 (1978), reconsid. denied, 71 F.C.C.2d 235 (1979)
 
 
 [134]
 50 F.C.C.2d 1038 (1975). Public Service Broadcasters involved a Class B station, without links to any relevant AM station, licensed to a city with a population of 21,200 people but near a city of 69,100 people not within the same Standard Metropolitan Statistical Area applying to locate its transmitter "midway" between the two cities. The applicant had not sought to change its allocation to the larger city prior to its application to locate its transmitter midway between the two. From the midway location the applicant could provide a "principal city" signal to all of the larger city but could also provide such a signal to its city of license. The Commission characterized the issues in Public Service Broadcasters as raising a Suburban Community question but not a de facto reallocation question. The Commission ruled that there was no Suburban Community issue in the case sufficient to require a section 309 hearing
 
 
 [135]
 The appellants in these cases have argued that the Commission committed two procedural errors in addition to failing to designate the applications before us for a section 309 hearing. In view of our conclusion that a section 309 hearing is required in each case, we find it unnecessary to decide these questions
 First, we are urged to find that the Commission erred in accepting the multipath interference allegations of KDAB from an unverified engineering statement unsupported by an affidavit of a person with personal knowledge of the engineering facts underlying the statement. But because we hold that, even were it accepted as true that KDAB was experiencing multipath problems from its Ogden transmitting site, its proposal to move near Salt Lake City would require a section 309 hearing, we do not need to reach the question whether the unverified engineering submission rose to the level of "substantial evidence on the record" or comported with the requirements of section 309(d) of the Communications Act or section 1.580(j) of the Commission's rules.
 Second, we are urged to find that the Commission violated its own rules in failing to find that the amendment of Ben Lomond's application to construct KZAN at Farnsworth Peak rather than near Ogden constituted a "major amendment" within section 1.573(a)(1) of the Commission's rules, thereby necessitating public notice and an opportunity to respond. But because a section 309 hearing will provide ample opportunity for interested parties to submit comment, we do not need to reach this question either.
 
 
 [1]
 In particular, I fully concur with the court's declaration that
 it is the Commission not this court to whom Congress gave the authority to determine in the first instance whether issuance of construction permits and licenses meets the various requirements set down by statute, FCC regulations, and precedent; and it is the Commission not this court to whom it gave the authority in the first instance to decide whether it will make that determination only after a full hearing.
 Majority Opinion at 971. I also agree with the court that its "factor" analysis should not be read as foreclosing any future decisions by the Commission concerning when full hearings are appropriate, even including decisions which reject the "factor" analysis outright, so long as those decisions are "accompanied by a reasonable explanation in harmony with the Commission's statutory obligations to hold hearings whenever a 'substantial and material' question of fact remains in dispute." Id. at 972.
 
 
 [2]
 D & B Broadcasting Co., Inc. (KDAB), 67 FCC2d 570, 573 (1978) ("The unusual terrain of northern Utah, which makes the (Farnsworth Peak) site particularly advantageous, is a key element in our decision...."); D & B Broadcasting Co., Inc. (KDAB), 69 FCC2d 1116, 1121 n.14 (1978); see Sworn Affidavit of Robert L. Chamberlin, Chief Engineer, Statement of Power Savings, Joint Appendix (hereinafter J.A.) at 309 (estimated savings of over 40% when compared to the old Little Mountain site); 47 C.F.R. § 73.315(b) (1979) ("In providing the best degree of service to an area, it is usually preferable to use a high antenna rather than a lower antenna with increased transmitter power.")
 
 
 [3]
 D & B Broadcasting Co., Inc. (KDAB), supra, 67 FCC2d at 571-72
 
 
 [4]
 In fact the field statement was supported by a number of affidavits, including those from a chief engineer and two licensed radio-telephone operators. See J.A. at 305-08. See also Affidavit of Steve Lawson, Executive Vice President, Ogden Area Chamber of Commerce, J.A. at 315-16 ("Salt Lake signals ... provide much more consistent coverage (in Ogden).... The fact is that KDAB must operate from the Oquirrhs (i. e., Farnsworth Peak) to compete in its own market.... KDAB (presently) has the poorest signal in our community....") (emphasis supplied)
 
 
 [5]
 Ironically, before the move to Farnsworth Peak, Salt Lake City's FM stations were providing better reception to Ogden than KDAB, the Ogden station, was providing to its own city of license! While the Salt Lake City stations in this litigation now challenge KDAB's ability to be heard clearly in their hometown, they are quite content to be heard more clearly than the Ogden station in the latter's hometown. See D & B Broadcasting Co., Inc. (KDAB), 67 FCC2d, supra, at 572. Competing over the other fellow's home turf is always more fun
 
 
 [6]
 See also Hall Broadcasting Co., Inc. (WIYD-FM), 44 RR2d 637, 640-41 (1978) (continuation of city-grade service to original community, and minimal loss area, are key factors in denying hearing on Berwick/de facto reallocation issues) (Commission finds that "(t)he crucial fact here is that operating as proposed (applicant) will continue to provide Palatka (the community of license) with the requisite (city-grade) service, and not that a portion of Jacksonville (a nearby larger city) will receive such service. Nor is it dispositive that a part of Jacksonville may receive a signal of greater intensity than Palatka." (Emphasis supplied)); Central Alabama Broadcasters, Inc. (WSLA-TV), 68 FCC2d 1339, 1340 (1978) ("De facto reallocation requires that there be an element of removal of the channel from one city and an effective use in another city; there can be no reallocation if either element is missing.")
 
 
 [7]
 See Majority Opinion at n.40
 
 
 [8]
 See id. at 972
 
 
 [9]
 See id. at 973
 
 
 [10]
 See id. at 973
 
 
 [11]
 See D & B Broadcasting Co., Inc. (KDAB), supra, 67 FCC2d at 572; cf. Affidavit of Steve Lawson, Executive Vice President, Ogden Area Chamber of Commerce, J.A. at 315-16 ("KDAB ... serves community interests better than any of the other Ogden stations.")
 
 
 [12]
 See, e. g., Rhode Island Television Corp. v. FCC, 320 F.2d 762, 766 (D.C.Cir.1963), quoting with approval the FCC's decision in favor of television station's request to move its antenna closer to Providence, a nearby city larger than New Bedford, the city of license:
 "The mere fact that as a result of the proposed modification WTEV will improve its signal to the Providence area from Grade B to Grade A does not warrant (the conclusion that there has been a channel reassignment). In fact WTEV will continue to be a New Bedford station, will maintain its main studio in New Bedford*, will place a principal city signal over that community and will be primarily responsible for providing for the needs of that community under the Rules. Accordingly, grant of the proposal will not change the channel assignment....
 " * The permittee does not propose to establish studio facilities in Providence."
 See also Community Telecasting Co. v. FCC, 255 F.2d 891, 893 (D.C.Cir.1958) ("The Commission has frequently ruled that a station is identified by the place where its studios are kept, not the location of its transmitter or antenna."); General Media Television, Inc., 27 FCC2d 861, 863 (1971) ("A de facto reallocation issue does not arise merely because a licensee proposes an extension of a station's service area, and in some circumstances, the retention of the station's main studio in its community of license may itself constitute sufficient contact with the community....").
 The location of the studio is frequently mentioned along with evidence on local programming to determine whether a Berwick/de facto reallocation issue really exists. See, e. g., Garlund, Gareth & Anna W. (KIQO), 68 FCC2d 1382, 1384 (1978); General Media Television, Inc., 27 FCC2d 861, 863 (1971); Streets Electronics, Inc. (KGEO-TV), 20 FCC 1121, 1169 (1956). The importance of the local programming factor cannot be ignored, since it goes to the heart of the statutory policy governing the distribution of radio licenses. See En Banc Programming Inquiry, 44 FCC 2303, 2311 (1960):
 It is generally recognized that programming is of the essence of radio service. Section 307(b) of the Communications Act requires the Commission to "make such distribution of licenses ... among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same." Under this section the Commission has consistently licensed stations with the end objective of either providing new or additional programming service to a community, area or state, or of providing a new or additional "outlet" for broadcasting from a community, area, or state.... (A)ppropriate attention to local live programming is required.
 (emphasis in original).
 
 
 [13]
 D & B Broadcasting Co., Inc. (KDAB), supra, 67 FCC2d at 572
 
 
 *
 After this dissenting opinion was filed, the majority opinion was revised so that it no longer requires a full evidentiary hearing on remand. Despite this revision, of which I approve, the gist of the dissent still seems relevant to any proceedings on remand